12818

PEURIFOY, REC'R, v. LOYAL *ET AL.*

(151 S. E., 579)

272

*Messrs. Ashley C. Tobias, Jr.,* and *Charles I. Dial,* for appellant, National Surety Co.,

*Messrs. Herbert & Dial* and *Melton & Belser,* for appellant, American Surety Company,

Messrs. *G. Duncan Bellinger* and *J. B. Murphy,* also for appellants.

Messrs. *C. T. Graydon* and *C. N. Sapp,* for respondents, Miss Ivy Mauldin and J. B. Bostick,

Mr. *D. W. Robinson,* for respondent, James E. Peurifoy, Rec'r,

Mr. *George Wittkowsky*, also for respondents.

January 24, 1930.

The opinion of the Court was delivered by MR. ACTING JUSTICE C. G. WYCHE.

This action was commenced on November 24, 1926, by James E. Peurifoy, Receiver of the American Bank & Trust Company, against I. M. Mauldin, the former president of the bank, and the American Surety Company of New York. The complaint alleges that the American Surety Company of New York executed and delivered its bond, whereby it insured the American Bank & Trust Company in the sum of $25,000.00, against any loss of moneys, securities, or property through any dishonest act committed by any of its salaried officers or employees; that on November 21, 1925, the defendant American Surety Company of New York executed and delivered a similar bond for an additional sum of $25,000. It is further alleged that, while these bonds were in force, the defendant, I. M. Mauldin, a salaried officer of the bank, secretly took, embezzled, and converted to his own use certain First Carolinas Joint Stock Land Bank bonds of the value of $30,907.20, and that the taking of these securities by Mauldin was in breach of trust with fraudulent intention and was such a dishonest act as was insured against by the defendant American Surety Company of New York.

The American Surety Company, by its amended answer, set up among other things that the defendant National Surety Company had come into possession of the bonds alleged to have been dishonestly taken with knowledge of such defalcation and asked that the National Surety Company be joined as a party defendant, which was ordered by the Supreme Court in the case of *Peurifoy v. Mauldin,* 142 S. C., 7, 140 S. E., 253. The American Surety Company further answered that the conduct of Mauldin did not constitute a breach of trust with fraudulent intention, that his actions had been ratified by the authorized officers of the bank, and that the bank had forfeited its right to recover by not notifying the surety within 10 days after the discovery of the alleged loss.

The National Surety Company filed a reply to the charges made by the American Surety Company denying the material allegations thereof.

Before the trial of the case I. M. Mauldin, former president of the bank, died, and O. P. Loyal, administrator of his estate, was substituted as defendant in his stead.

Upon the trial of the case before Judge Mann, the jury rendered a verdict in favor of the plaintiff against O. P. Loyal, administrator of the estate of I. M. Mauldin, deceased, and against the American Surety Company of New York for the value of the bonds and interest. The verdict was in favor of the defendant National Surety Company. A motion for a new trial was made on behalf of the American Surety Company, and a similar motion on behalf of the administrator, Loyal. Both motions were refused. The defendant American Surety Company has appealed from the judgment entered upon the verdict. In the agreed statement of the case it appears that O. P. Loyal, administrator of the estate of I. M. Mauldin, appeals, but there are no exceptions in the record in behalf of the estate, and there is therefore nothing before the Court upon which an appeal by the estate could be considered.

After the rendition of the verdict and the refusal of the motions for a new trial, his Honor, Judge Mann, signed a consent order dated March 7, 1928, as follows:

"In the above-entitled cause, since the trial and rendition of the verdict, it appears that a number of questions have arisen as to certain collaterals and securities which were placed with the Receiver of American Bank & Trust Company, and also some question as to the amount in the hands of National Surety Company and to whom it should be paid; and that it is necessary to make additional parties.

"It is, therefore, by consent of all counsel present in open Court, ordered:

"1. That Miss Ivy Mauldin, Southern Motor Company and J. B. Bostick be made additional parties to this action, and that the supplemental complaint be forthwith served upon them; and that they and all other parties to this action be authorized and empowered to serve and file within twenty days from this date such additional pleadings as they may be advised are proper.

"2. That all issues arising herein be referred to the Master of Richland County to take and hear all evidence offered in regard thereto and to make and report his findings and conclusions of law and fact to this Court with all convenient speed.

"Let a copy of this order be served with the supplemental complaint on the additional parties provided for therein."

In accordance with this order the Receiver filed a supplemental complaint making Miss Ivy Mauldin, Southern Motor Company and J. B. Bostick party defendants and they duly answered the supplemental complaint. The Master made his report, and the plaintiff and the American Surety Company filed exceptions. Upon these exceptions the matter came on to be heard before his Honor, Judge Townsend, who signed a decree dated July 17, 1928, to which the American Surety Company and the National Surety Company have filed exceptions.

There are, therefore, two separate appeals in this case: (1) The appeal of the American Surety Company from the verdict in the jury trial against it, and (2) the appeal of the two surety companies from the decree of his Honor, Judge Townsend in the matter which was referred to the Master.

The appeal of the American Surety Company from the judgment in favor of the Receiver against it for $35,252.23 will be considered first.

The second exception charges that the Court erred in not directing a verdict in favor of the American Surety Company, and, since that will necessitate a brief discussion of the facts in the case, it will be considered first. That exception is as follows:

"II. Because his Honor, the trial Judge, erred in refusing to direct a verdict in favor of the defendant, American Surety Company of New York, upon the grounds of such motion as made, namely:

"(a) On the ground that there was no evidence that I. M. Mauldin took and used the Land Bank bonds with a criminal intent or intended to commit a breach of trust, as alleged, but on the contrary the only reasonable inference to be drawn from the testimony shows that Mauldin in using the bonds did so in good faith with the intention and purpose of holding the bank harmless and free from loss in the transaction.

"(b) On the ground that the undisputed evidence showed that the insured, American Bank & Trust Company, failed to give notice of the taking and loss of the bonds to the American Surety Company of New York within ten days after its discovery of such loss as required by the express provision of the surety bonds, or to furnish proof of such loss within ninety days after such discovery, as required."

In the latter part of February, 1926, about four months before the American Bank & Trust Company closed its doors, the defendant, I. M. Mauldin, then president of the

bank, and J. Pope Matthews, then chairman of the board of directors, were each separately engaged in controversy with the federal government in reference to their personal income taxes, involving in each instance the sum of $25,000. The department had ruled against them, and they desired to have the decision reversed on appeal. An appeal bond was required of each, and, before the surety company would sign the bonds, it required these two men to deposit with the surety company certain collateral or indemnity. The bonds had to be filed on February 20, 1926. On that day Mauldin and Matthews purchased from the First Carolinas Joint Stock Land Bank bonds of the par value of $61,000. These bonds were paid for by the American Bank & Trust Company, and on the same afternoon the bonds were delivered to the National Surety Company by Mauldin and Matthews to indemnify it against loss on account of signing the tax appeal bonds. The National Surety Company then executed the appeal bonds for Mauldin and Matthews. Nothing was said about this transaction by Mauldin or Matthews until March 1, 1926, at which time they were holding a meeting of the finance committee of the bank. This committee was composed of five members: Byrd, DuPre, Miller, Mauldin, and Matthews. Miller was not present. So, the committee at this time was composed of the other four.

Byrd testified that, after completing all business coming before the committee, as the members started to leave, Mr. Matthews or Mr. Mauldin stated: "We have used some of the bank's bonds and we want to bring it before the Finance Committee. * * * It was that they had used the bonds * * * just wanted them temporarily * * * not over a week or ten days and we will return them. * * * They didn't tell when they took the bonds, said they had used them."

Mr. M. B. DuPre, the remaining member of the finance committee, described what occurred at that time as follows: "Mr. Mauldin was sitting on my right, or my left and he

started to clear his throat, you know how he did, and said: * · * * 'You know Matthews has been sick in the hospital and the time has come when we have got to do something, so temporarily we had to put up a bond for the government * * * for these revenue taxes due the government.' And I don't know the exact words now he said but Mr. Mauldin then said, we took, borrowed or exchanged. I don't know what he used—I want to be perfectly frank about it, but he conveyed the idea that they had taken some bonds from the bank and used them to put up for a surety bond for the government. * * * 'Yes, but it is only a temporary proposition—just a matter of a few days' (using his hands just like I am using mine). 'We took these things from here (indicating) and we will put them back and in the meantime we will put up security to secure the bank if any loss occurs.' * * * The impression I got was that it was a temporary taking or borrowing, but it didn't appear to me to be regular. I thought the original would be put back. I talked to Matthews several times, don't think I talked to Mauldin. Matthews told me several times that everything was all right."

Mr. Byrd prepared a resolution, which was then adopted by the committee composed of the two members who had used the bonds, and the two others. The resolution is as follows: "Permission granted to J. Pope Matthews and I. M. Mauldin to borrow from Bond Department of bank $30,000, and $31,000 respectively. The said J. Pope Matthews and I. M. Mauldin to place with the Bond Department of bank their personal obligations, such as shall be acceptable to State Bank Examiner in place of said bonds so borrowed, the said bonds borrowed to be used temporarily as collateral against bond furnished by the National Surety Company on behalf of the said J. Pope Matthews and I. M. Mauldin and in favor of Jno. F. Jones, Collector of Internal Revenue."

Mr. Earle, who was cashier of the bank, testified that he was not a director, had no knowledge of the bank acquiring the bonds in question or of Mr. Matthews or Mr. Mauldin

using them. He had no knowledge of the entries in the books. The entries seem to have been made under the instruction of Mr. Mauldin and without conference with the cashier. Several weeks after the bonds had been used, Mr. Byrd, a member of the finance committee, asked the cashier if he ever examined the minutes of the finance committee, and after they were written up Mr. Earle looked at the minutes and found the resolution which had been adopted by the finance committee composed of Mauldin, Matthews, DuPre, and Byrd. Earle testified that it was not his duty to put it down in the books; that it was not customary to turn the bonds over to the cashier, and further:

"When I saw it (the Minutes) I saw where the Finance Committee had approved the loan conditioned upon them putting up collateral satisfactory to the Bank Examiner in lieu of these bonds. I passed that up—did not consider it anything wrong. I felt that as the Finance Committee was part of the board it was up to them. Q. And it was entirely—so you consider that the transaction was all right and you continued on in your capacity as cashier of the bank? A. Yes, sir. * * *

"The Bond Department was actively in the hands of Mr. A. C. Heyward and not directly in my charge. * * * It not infrequently happens in banking matters that temporary arrangements are made lasting over a few hours or a few days. I had known Mr. Mauldin ten or twelve years He was a brother of Judge Mauldin and Col. Mauldin. Prior to this transaction I had not found him engaged in questionable dealings. I had absolute confidence in Mr. Mauldin."

The American Surety Company contends that there was no evidence in the case that I. M. Mauldin took and used the land bank bonds with criminal intent or intended to commit a breach of trust, but on the contrary the only reasonable inference to be drawn from the testimony was that Mauldin used the bonds in good faith with the intention and purpose of holding the bank harmless and free from loss in the trans-

action. The testimony above related, as given by the cashier and two directors of the bank, tends to sustain the surety company's contention that Mauldin did not intend to defraud the bank of the bonds, and, if this were all the testimony relative to the transaction, the motion made by the surety would present a very serious quesion for decision by this Court, but there is other testimony given by Mr. A. F. Lever, Mr. H. E. Way, Mr. W. W. Bradley, and other witnesses, showing the manner in which the bonds were procured and the way in which they were handled which made it a question of fact as to whether or not the bonds were taken with fraudulent intention. These facts were properly submitted to a jury and have been decided against the surety company and the Mauldin estate; and the motion for a directed verdict upon this ground was properly overruled.

It is next contended by the surety company that the American Bank & Trust Company failed to give notice of the loss sustained *within ten days after discovery of the loss*. Section 1 of each bond reads as follows:

"The American Surety Company of New York, a corporation of the State of New York, with its Home Office in the City of New York, New York, hereinafter called the Underwriter, in consideration of an annual premium agrees to indemnify American Bank & Trust Company of Columbia, Columbia, S. C., hereinafter called the Insured, against the direct loss sustained while this bond is in force and discovered, as hereinafter provided, of any money or securities, or both, as defined in Section 5 hereof, in which the insured has a pecuniary interest, or held by the insured as collateral or as bailee, trustee or agent, and whether or not the Insured is liable therefor (such money and securities being hereafter called Property), in an amount not exceeding Twenty-five Thousand Dollars ($25,000.00), as follows:

"A. Through any dishonest act, wherever committed, of any of the employees, as defined in Section 6 hereof, whether acting alone or in collusion with others."

Section 6 of the bond reads as follows: "The word 'employees' as used herein shall be deemed to mean the officers, clerks, and other persons in the immediate employ of the insured during the currency of this bond, at its office or offices covered hereunder, but not to mean any person or persons employed by any other banking institution which the insured shall have taken over, unless the underwriter shall have given its written consent thereto, nor to mean any persons, firms or corporations furnishing transportation, trucking, messenger service or the like, or any person or persons employed thereby."

Section 16 reads, in part, as follows:

"This bond is subject to the following express conditions:

"At the earliest practicable moment, and at all events not later than ten days, after the insured shall discover any loss hereunder, the insured shall give the underwriter notice thereof by registered letter or telegram addressed to it at its home office and shall also, within three months after such discovery, furnish to the underwriter at its home office affirmative proof of loss with full particulars. Legal proceedings for recovery of loss hereunder shall not be brought prior to the expiration of three months from the furnishing of such proof, nor after the expiration of twelve months from the discovery of such loss."

It is claimed by the surety company: First, that the finance committee representing the board of directors, under the by-laws of the bank, had *discovered the loss* at the time the resolution prepared by Mr. Byrd was adopted; second, that the two directors, Byrd and DuPre, at the time the committee met, *discovered the loss,* and that their discovery was imputable to the bank; and, third, that Earle, the cashier, had discovered the loss and his discovery can be imputed to the bank.

The by-laws of the bank, by Article 3, provides for a board of directors of not less than 12 nor more than 30. In this case there were 22. By Section 9 it was provided that

the board of directors should appoint a finance committee "consisting of the chairman of the board, president of the bank, and not less than three nor more than five other members, which committee shall be a part of the permanent organization of the bank and shall, in the interim between meetings of the board of directors, exercise powers of the board in accordance with the general policy of the bank and the board of directors." The finance committee was composed of Matthews, Mauldin, Byrd, DuPre and Miller, 5 in number. Meetings of the finance committee were to be held at least three times per week and a majority of the members was necessary to constitute a quorum for the transaction of business. At the meeting on March 1, 1926, there were present I. M. Mauldin, the president of the bank, J. P. Matthews, chairman of the board, with two other directors, M. B. DuPre and J. A. Byrd, and it was this committee as thus constituted, as a committee exercising the powers of the board of directors, which the American Surety Company contends *discovered the loss* and became duty-bound to notify the surety of its discovery, and which is relied upon in a large measure by the surety company.

The jury has found by its verdict that Matthews and Mauldin were both engaged in the alleged unlawful acts constituting a breach of the bond, and, so far as any matter relative to the taking of the bonds was concerned, this was not a lawful meeting of the finance committee as would bind the bank, and there could be no discovery of a loss by it as a committee.

The powers of the board of directors during the interim between their meetings is conferred only on the finance committee, as a committee, and this committee can only act when a quorum is present. The same rule governs the meetings of the committee as governs the board of directors. 3 Fletcher on Corps., p. 3179, § 2003, p. 3180, § 2005, p. 3073, § 1887; 3 Cook on Corps. (7th Ed.), § 712, pp. 2435, 2436, § 713a, pp. 2456-2458, 7 R.

C. L., pp. 439, 440, § 427, p. 449, § 435; *Star Mills v. Bailey,* 140 Ky., 194, 130 S. W., 1077, 140 Am. St. Rep., 372 (1910); 1 Morse on Banks & Banking (6th Ed.), § 124; *Traders' & Truckers' Bank v. Black,* 108 Va., 59, 60 S. E., 744, 745.

Mr. Cook thus puts it: "Moreover, the directors can contract and act only as a board duly qualified and assembled. The members of the board cannot agree separately and outside of the meeting and thereby bind the corporation. Nor can a minority of the board meet and bind the board. A majority must be present and then a majority of that majority binds the corporation."

7 R. C. L. thus puts it at page 439: "The authority of the directors or trustees is conferred upon them as a board, and they can bind the corporation only by acting together as a board; a majority of them in their individual names cannot act for the board itself and bind the corporation. In order to exercise their powers they must meet and act as a board so that they may hear each other's views, deliberate and then decide. * * * An individual director has no general authority to make contracts for the corporation. * * * "

And the same author at page 449, § 435, under the head, "General Authority of Committee" says: "A majority of the committee when duly assembled, may act in the absence of the other members. * * * But it is essential that a majority of the committee join in any action to bind the corporation."

Mr. Morse, at Section 124, says:

"The bank is bound by the action of the majority of the board, taken in the manner usually adopted by the board, no matter how informal or peculiar that manner may be. An expression of the will of the majority is what the law looks for and recognizes. It seems, however, that it is indispensable to the validity of any action that it should be the vote of a majority of a quorum at a regular and legal meeting of

the board. Thus, it has been held that the assent of a majority of the directors, expressed by them individually, and not at a regular stated meeting of the board, is not sufficient to confer upon the cashier authority to do any act which he would not have authority to do unless it were conferred upon him by the directors.

"The only powers conferred by statute upon the directors of a national bank are vested in them as a board, and when acting as a unit, and therefore the assent of a majority of the individual members of the board, acting separately and singly, is not the assent of the bank, and is not binding upon it."

Mr. Fletcher, Vol. 3, p. 3180, § 2005, thus states it: "The Executive Committee can act only as a whole. * * * A majority constitute a quorum, unless it is otherwise provided, the same as in case of meetings of the full board."

And again at pages 3069, 3070, § 1882, reaffirmed in the Supplement of 1921, p. 327: "Less than a majority cannot meet and bind the corporation by an act or resolution unless expressly authorized."

A quorum is not present in passing upon a matter in which one of the directors is personally interested, where only a bare quorum is present when he is counted. And likewise an interested director or committeeman cannot be counted in order to make up a quorum to pass upon any matter in which such director or committeeman is interested. 3 Cook on Corps. (7th Ed.), p. 2464, § 713-a; 7 R. C. L., 445, 446, 480, §§ 431, 461; *Hotaling v. Hotaling,* 193 Cal., 368, 224 P., 455, 458, 56 A. L. R., 740 (1924); *Curtin v. Salmon River, etc., Co.,* 130 Cal., 345, 62 P., 552, 80 Am. St. Rep., 135, 136; 4 Fletcher on Corps., pp. 3607, 3608, 3610, §§ 2352, 2354; note and cases 17 Am. St. Rep., 300, etc.

7 R. C. L. thus states it: "The general rule of agency which prohibits an agent from representing both himself and his principal in a transaction in which their interests

are adverse and antagonistic, applies where a corporate officer attempts to represent both himself as an individual and the corporation in a transaction in which his and the corporate interests are adverse and antagonistic. * * * A director cannot, according to the better view, form a part of a quorum to act on a proposition in which his individual interest is adverse to the corporation, though he does not vote upon the matter."

In the *Hotaling case,* the Court says: "The board of directors, as provided for in the by-laws, consisted of five members. Under the by-laws and under the state law a majority of the board of directors, or three or more, was necessary to form a quorum or to perform a valid corporate act (Civ. Code, § 308), even though there was a vacancy in the board (*Porter v. Lassen County Land & Cattle Co.,* 127 Cal., 261, 269, 59 P., 563; *Pennington v. George W. Pennington Sons,* 27 Cal. App., 57, 148 P., 947; 3 Cook on Corp. [7th Ed.], § 713-a, p. 2462). At the meeting at which the resolution was adopted which purported to authorize the execution of this deed there were but three directors present, including Richard, who was named therein as grantee. Being personally interested in this transaction adversely to the corporation he was disqualified thereby to vote the authorization, and his presence could not be counted to make a quorum for that purpose."

And Mr. Fletcher, Vol. 4, p. 3610, § 2354, says: "The same rules which preclude an interested director from uniting with other directors in the creation of an obligation in favor of himself by his vote, forbid him from uniting with them in creating such obligation by an act or exercise of his official position; and a meeting at which there is not a majority of the directors, exclusive of such interested director, is not a competent board for the transaction of any corporate business."

And the same author, Volume 3, § 3075, and in the Supplement of 1921, p. 327, says: "A director who is disquali-

fied by reason of personal interest in the matter before a director's meeting, loses, *pro hac vice,* his character as a director and he cannot be counted for the purpose of making out a quorum."

And the same author, Volume 4, pp. 3607, 3608, § 2352, says: "The vote of an interested director cannot be counted to make up a majority vote necessary to pass a resolution of the Board of Directors."

There being no evidence in the case that the finance committee, as a duly and legally constituted committee, representing the board of directors, had *discovered the loss,* this contention of the surety company cannot be sustained.

It is further argued that the cashier of the bank and the two directors who were present at the committee meeting, personally, had discovered the loss, and their knowledge should be imputed to the bank. This case does not fall within the general rule applicable to banks in their dealings with the general public. Much of a bank's business is necessarily intrusted to its subordinate officers or servants, and in many cases it will, upon the doctrine of constructive notice, be held to know what comes to their knowledge. This rule is founded upon necessity and has for its object the protection of those who deal with and trust the bank. The transaction out of which this bond grew was an altogether different kind from those usually occurring between a bank and its customers. The contract was not made for the purpose of protecting the surety company in any dealings it might have with the bank, but, on the contrary, the surety company undertook to protect the bank in the matter of delegating to Mauldin, its president, some of the duties it owed to others. The surety company contracted to save the bank from loss on account of any dishonest act wherever committed by reason of its trusting the president with his duties. The bank did not undertake nor agree that the other officers and employees of the bank would be faithful to their trust. Notice to or knowledge of the cashier or individual

director in case of fidelity bond of employees is not imputable to the bank, and his laches or failure to communicate it to the board of directors or to the surety company does not release a fidelity surety bond. The fact that there were other unfaithful officers and agents of the corporation who knew or connived at the infidelity of the president of the bank ought not, in reason, and does not, in law or equity, relieve the surety company from responsibility for his alleged dishonest act. The very bond itself recognizes this principle of law when it agrees to insure the bank against "loss through any dishonest act, whether acting alone or in collusion with others."

The general rule that knowledge or information communicated to an agent or officer of a corporation is notice to the corporation, which is announced by this Court in *Equitable Trust Co. v. Columbia National Bank,* 145 S. C., 91, 142 S. E., 818, is not applicable to fidelity and surety bonds. *Fidelity & Deposit Co. v. Courtney,* 186 U. S., 361, 363, 22 S. Ct., 833, 46 L. Ed., 1201, 1202; 4 Fletcher on Corporations, page 3472, § 2242; 1 Morse on Banks & Banking (6th Ed.), § 33, and note and cases thereunder, page 116, § 37, pages 119-121, § 38, page 122, § 42, pages 131, 132; *Wait v. Homestead Building Association,* 76 W. Va., 431, 85 S. E., 643, 644 (1915); *Fidelity & Casualty Co. v. Gate City National Bank,* 97 Ga., 634, 25 S. E., 393, 394, 33 L. R. A., 821, 54 Am. St. Rep., 440; *American Bonding Co. v. Spokane Building & Loan Society,* 65 C. C. A. (Wash.), 124, 130 F., 737.

In the note to Section 33, of Mr. Morse, the author says: "The surety does not agree to indemnify, provided the other officers conduct themselves properly, but if O. conducts himself improperly."

And in the same note, quoted from Chief Justice Shaw of Massachusetts in an opinion [*Amherst Bank v. Root, 2* Metc. (Mass.), 522] says: " "The idea that the cashier is excused by the act or negligence of the directors arises from

considering the board of directors as the corporation, and then applying the very equitable principle, that one ought not to recover of a surety damages caused by himself. We think the principle does not apply.' The board is not the corporation in such matters. To hold it so would defeat the very object of the bond. * * * No negligence of those with whom rests the duty of supervision, short of a virtual connivance at the official delinquency, or a willful shutting of the eyes to the fraud about to be committed can release a surety. * * * The weight of authority and reason seems heavily against releasing the surety because of the directors' fault, unless it is so expressed in the bond, or the organic law contains some provisions touching such matters, which may therefore be considered as contemplated in the contract of suretyship."

And the same author opens Section 37 with the following statement supported by the authorities in the footnote: "No act of the president or directors in violation of their duty to the stockholders can discharge the surety on the bond of a bank officer."

And in the same Section, page 120, it is said: "The fact that the cashier consented to the bookkeeper's application to his own use of money not due him constitutes no defense to an action on the bookkeeper's bond." Citing in support thereof *Phillips v. Bossard* (D. C.), 35 F., 99, 100.

And further in the same paragraph, pages 120, 121:

"The negligence of one agent, or set of agents, cannot deprive the corporation of its remedy for the default of another agent.

"Indeed, no act or vote of the directors of a bank, contrary to their duties, and in fraud of stockholders' rights and interests, will excuse the cashier or his sureties from a violation of the stipulation in his bond, well and truly to execute the duties of his office."

And in Section 38, p. 122: "The object of the bond is to guarantee to the bank the faithful performance by the

cashier of his duties. His duties and obligations are not affected by the negligence of the other officers or agents of the bank, and such negligence does not discharge his sureties."

In § 42, pages 141, 142, the author announces the same principles which are set forth in *Fidelity & Casualty Co. v. Gate City Nat. Bank*, and in *American Surety Co. v. Pauly*, 170 U. S., 133, 18 S. Ct., 552, 42 L. Ed., 977, and *Fidelity & Deposit Co. v. Courtney*, and cites them respectively in support thereof.

In *Fidelity, etc., Co. v. Bank*, 97 Ga., 634, 25 S. E., 392, 393, 33 L. R. A., 821, 54 Am. St. Rep., 440, the question was whether a stipulation in a surety bond requiring the bank upon discovery of fraud or dishonesty on the part of the guaranteed employee, to give notice to the surety, and also immediately after knowledge by the bank of any act on the part of the employee involving a loss to the surety of more than $100, to notify the surety of the same. In disposing of it, Justice Lumpkin said:

"As naturally incident to a contract of this nature, the company stipulated that the bank should gain no benefit thereunder if it continued in its service an employee known to be unworthy of trust, without prompt notice to the company after he had been discovered by the bank to be untrustworthy. There is not a syllable in the contract, however, bearing the construction that the bank should exercise any degree of diligence in inquiring into or supervising the conduct of Redwine, in order that the company might be saved from loss through his misconduct. The bank did not undertake to exercise reasonable care and diligence to find out if Redwine had become untrustworthy, but as to this matter the company, in effect, invited the bank to repose in peace, for it guaranteed that Redwine would remain honest and faithful. Only after knowledge had actually come to the bank that he was, or had become, otherwise, was it under any duty to the company; and then it was   *   *   *   required to

immediately notify the company of what it had ascertained. * * * The 'knowledge' referred to meant actual knowledge. * * *

"In the absence of any guaranty on the part of the bank that its other employees would be honest and faithful, and in view of the purpose of the condition inserted in the bond, it would seem that the better construction of it would be that the bank only obligated itself to act in good faith, and impart only actual knowledge on its part. The bond would, indeed, be of no practical protection, if, in order to realize its benefits, the bank had to insure, not only the honesty and fidelity, but the faithful and conscientious attention to duty, of a dozen others of its employees."

Likewise the Supreme Court of the United States denies any duty on the part of the employer to exercise diligence to ascertain whether the employee has defaulted or done any act indicative of untrustworthiness, to the end that the sureties may be protected, and repudiates the view that the docrine of constructive notice applies to the subject. In *Fidelity, etc., Co. v. Courtney,* 186 U. S., 342, 22 S. Ct., 833, 841, 46 L. Ed., 1193, the trial Court instructed the jury that the cashier's knowledge of the infidelity and fraud of the president of the bank was not notice to the bank of which the sureties could avail themselves as a ground of discharge. The Court says:

"It is well settled that, in the absence of express agreement, the surety on a bond given to a corporation, conditioned for the faithful performance by an employee of his duties, is not relieved from liability for a loss within the condition of the bond by reason of the laches or neglect of the board of directors, not amounting to fraud or bad faith, and that the acts of ordinary agents or employees of the indemnified corporation, conniving at or co-operating with the wrongful act of the bonded employee, will not be imputed to the corporation. *United States v. Kirkpatrick* (1824), 9 Wheat., 720, 736, 6 L. Ed., 199, 203; *Minor v. Mechanics'*

*Bank v. Root* (1841), 2 Metc. [Mass.], 522; *Louisiana State Kentucky* (1829), 2 J. J. Marsh. [Ky.], 564; *Amherst Bank v. Root* (1841), 2 Metc. [Mass.], 522; *Louisiana Bank v. Ledoux* (1848), 3 La. Ann., 674, *Pittsburgh, Ft. W. & C. P. Co. v. Shaeffer* (1868), 59 Pa., 350, 356; *Atlas Bank v. Brownell* (1869), 9 R. I., 168, 11 Am. Rep., 231. The doctrine of these cases is thus epitomized in 59 Pa., 357:

"Corporations can act only by officers and agents. They do not guarantee to the sureties of one officer the fidelity of the others. The rules and regulations which they may establish in regard to periodical returns and payments are for their own security, and not for the benefit of the sureties. The sureties, by executing the bond, became responsible for the fidelity of their principal. It is no collateral engagement into which they enter, dependent on some contingency or condition different from the engagement of their principal. They become joint obligors with him in the same bond, and with the same condition underwritten. The fact that there were other unfaithful officers and agents of the corporation, who knew and connived at his infidelity, ought not in reason, and does not in law or equity, relieve them from their responsibility for him. They undertake that he shall be honest, though all around him·are rogues. Were the rule different, by a conspiracy between the officers of a bank or other moneyed institution, all their sureties might be discharged. It is impossible that a doctrine leading to such consequences can be sound. In a suit by a bank against a surety on the cashier's bond, a plea that the cashier's defalcation was known to and connived at by the officers of the bank, was held to be no defense. *Taylor v. Bank of Kentucky, 2 J. J. Marsh. [Ky.], 564.*"

And further, quoting with approval from a Louisiana case, *Louisiana State Bank v. Ledoux, 3 La. Ann., 674, 684: "It cannot be said that if one servant of a bank neglects his duty, and by his carelessness permits another servant

of the bank to commit a fraud, the surety of the fraudulent servant shall be thereby discharged."

And after citing and approving *American Surety Co. v. Pauly,* 170 U. S., 133, 18 S. Ct., 552, 42 L. Ed., 977, the Court says: "In the very nature of things, such a principle does not obtain in favor of a surety who has bonded one officer of a corporation, so as to relieve him from the obligations of his bond, by imputing to the corporation knowledge acquired by another employee subsequent to the execution of the bond (and from negligence or wrongful motives, not disclosed to the corporation), of a wrong committed by the official whose faithful performance of duty was guaranteed by the bond. As the rule of imputation to the principal of the knowledge of an agent does not apply to such a case, it must follow that it can only obtain as a consequence of an express provision of the contract of suretyship."

Further the Court says:

"Manifestly, this stipulation is not fairly subject to the construction that it was the intention that the neglect or omission of a minority in number of the board of directors or the neglect or omission of subordinate officers or agents of the bank should be treated as the neglect or omission of the bank. The provision is not that a minority in number of the board of directors or that subordinate officers or agents would exercise due and customary supervision, and would not condone a default of the bonded employee or retain him in his employment after the commission of a default, but the agreement is that the bank would do or not do these things. This in reason imports that the things forbidden to be done or agreed to be done were to be either done or left undone by the bank in its corporate capacity, speaking and acting through the representative agents empowered by the charter to do or not to do the things pointed out. * * * That is to say, the stipulation in all its aspects undoubtedly related to the bank, acting through its board

of directors or through an official who, from the nature of his duties, was in effect the vice principal of the bank."

"Now, applying the principles previously expounded to the case in hand, it is evident that the Court rightly refused to instruct the jury that the mere knowledge of one or more directors, less than a majority of the board, and of the vice-president of the bank, of the default of the president, was imputable to the bank."

It is therefore evident that the alleged failure of the cashier and the two directors to notify the bank and the surety does not in any wise release the surety on the ground that notice was not given within 10 days after discovery of the loss. Even though such were not the law, it is clear that neither the cashier nor either of the two directors ever *discovered any loss* within the meaning of the bond. The evidence is that, so far as their knowledge or belief was concerned, they did not think there had been or would be any loss. They believed the matter to be an irregularity, but not a dishonest act. They had implicit faith in Mr. Mauldin, the president of the bank, and at no times does it appear that any one of them felt that he had *discovered a loss* to the bank. To hold that the cashier and these two directors became duty bound to give notice to the surety company that they had *discovered a loss* under the terms of the bond would be to require them to give notice of something they neither knew nor believed.

The motion to direct a verdict in favor of the surety company was properly refused.

What has been said in discussing exception II disposes of exception III. The undisputed evidence shows that so far as this case is concerned there was never a meeting of a legally constituted finance committee upon which could be imputed any knowledge or discovery of a loss sufficient to bind the bank. His Honor was therefore correct in charging the jury that notice or knowledge of the loss of the bonds

could be brought home to the bank only by making the same known to the directors of the bank as a body.

Exception IV complains of error in submitting to the jury the issue of waiver. This exception is as follows: "Because his Honor erred in submitting to the jury the issue as to whether or not the American Surety Company of New York had waived the provision of the bonds requiring that notice be given within ten days after discovery of any loss thereunder; whereas, it is respectfully submitted, that there was no evidence of any such waiver, and his Honor should have so instructed the jury, as requested by the defendant, American Surety Company of New York.". There was ample evidence in the case upon which to submit this question to the jury and this exception is without merit.

The fifth exception charges that the Court erred in reference to its charge as to the degree of proof required to establish the breach of trust with fraudulent intention alleged. The exception is as follows: "Because his Honor erred in holding and charging the jury that the degree of proof required to establish the breach of trust with criminal intent on the part of I. M. Mauldin, which was the basis of the action, was the preponderance of the evidence merely; whereas, the complaint having charged and his Honor having held that the action was based upon the charge of a breach of trust with fraudulent intent amounting to a crime, that the correct rule in establishing such charge required the proof of such crime beyond a reasonable doubt and not merely by the greater weight of the evidence." This exception is overruled upon authority of *Salley v. Globe Indemnity Co.,* 133 S. C., 342, 131 S. E., 616, 43 A. L. R., 971, decided February 15, 1926.

The sixth exception complains of error in charging the law in reference to loans to an officer of the bank.

The exception is as follows: "Because his Honor charged plaintiff's requests 11 and 11-A to the effect that

an officer of a bank is forbidden by statute of this State to borrow from the bank without first obtaining the approval and consent, in writing, of two-thirds of the whole board of directors, and that the jury might consider the failure to first obtain such consent and authority in determining whether or not I. M. Mauldin had committed a breach of trust with fraudulent intent as alleged in the complaint; whereas, it is respectfully submitted that such charge was erroneous for the reason that the only offense alleged was the taking of the bonds in breach of trust and any evidence of an independent or different breach of statute law was irrelevant for the consideration of the jury, was liable to mislead them, and was highly prejudicial to the defendants."

There was evidence in the case which tended to show that Mauldin had borrowed from the bank money or bonds in violation of the statute relating to loans to officers of banks, and this was some evidence tending to show criminal intent, which was a circumstance to be considered by the jury upon the question of whether or not the bonds were appropriated by Mauldin with fraudulent intent.

The seventh exception is as follows:

"Because his Honor charged the plaintiff's 14th request as follows:

" 'The jury are instructed that neither the finance committee, nor Mr. Mauldin nor Mr. Matthews, nor even the State Bank Examiner, while he had charge, nor the board of directors after the corporation became insolvent, could waive or discharge any rights which the bank had under any of the bonds sued on in this case.' "

A careful reading of the charge given by the Court shows that this instruction was made clear to the jury to mean to apply after the corporation became insolvent. It is clear that after the bank became insolvent no one could waive or discharge any rights which the bank had under either of the bonds sued upon. This exception

is therefore without merit. This also applies to exception VIII.

The ninth exception is disposed of by the discussion of the law under exceptions II and III and is, for the reasons therein stated, overruled.

The first exception is as follows: "Because his Honor, Judge Mann, erred in admitting evidence of the negotiations for a compromise· of the controversy between James E. Peurifoy, as Receiver of the American Bank & Trust Company, and the attorneys for the estate of I. M. Mauldin and the American Surety Company, over the objection of the attorneys for the American Surety Company; it being respectfully submitted that the admission of such evidence was erroneous and contrary to the policy ·of the law, and prejudicial to the said defendant, and his Honor should have held that said testimony was irrelevant and incompetent as relating to a compromise and settlement of the issues in controversy."

The letters complained of were evidence directed against the National Surety Company, a party defendant· in whose favor the verdict of the jury was rendered. The letters had no connection with the defendant, American Surety Company, and there is no merit in this exception.·

The exceptions of the National Surety Company and the American Surety Company to the decree of his Honor, Judge Townsend, upon the matters which were referred to the master and which compose the second part of the appeal in this case, are overruled for the reasons stated by Judge Townsend in his decree. Let his decree be reported.

The judgments appealed from are affirmed.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES STABLER and CARTER concur.

MR. JUSTICE BLEASE did not participate.

MR. JUSTICE COTHRAN (dissenting): This action was originally commenced on November 24, 1926, by J. E.

Peurifoy, as Receiver of American Bank & Trust Company, against Ivy M. Mauldin and American Surety Company. The bank closed its doors on June 25, 1926, and on June 26th was taken over by the State Bank Examiner. On July 19, 1926, the plaintiff was appointed Receiver of its assets, under an order of Court passed in the case of *Rice v. Columbia*, 143 S. C., 516, 141 S. E., 705.

The defendant Mauldin had been president of the bank from the time of its organization until its collapse.

*It is alleged in the complaint that on February 20, 1926, the defendant, Mauldin, while a salaried officer and employee of the bank, committed a breach of trust with fraudulent intent, in that he "secretly took and embezzled, and converted to his own use, moneys and securities of said bank, to wit, bonds of First Carolinas Joint Stock Land Bank, of the value of Thirty Thousand Nine Hundred and Seven and 20/100 ($30,907.20) Dollars."*

It is also alleged in the complaint, and not controverted, that on August 18, 1924, and November 21, 1925, respectively, the defendant American Surety Company executed its several bonds, each in the sum of $25,000, insuring the American Bank & Trust Company against any loss of money, securities, or property, through any dishonest act whatever, committed by any of its salaried officers or employees.

The plaintiff contends that the conduct of the defendant Mauldin, which will be more particularly detailed hereinafter, constituted a breach of the bond, and that the American Surety Company is liable *for the value of the bonds appropriated by Mauldin,* and asks judgment against both.

Mauldin answered denying the material allegations of the complaint.

The American Surety Company answered, relying mainly upon the contentions that the conduct of Mauldin complained of did not constitute a breach of the bond; that it had been ratified by the authorized officers of the bank;

and that, conceding that it was a breach of the bond, the bank had forfeited its right to recover by not giving the notice required by the bond, after discovery of the alleged misconduct of Mauldin. It also contended that the National Surety Company, whose conduct in connection with the matter will be explained later, had come into possession of the bonds with full knowledge of the misconduct of Mauldin, and should be made a party, that it might be required to account for the value thereof. By an order, the National Surety Company was made a party defendant. That company appeared and demurred to the answer of the American Surety Company, so far as it was affected thereby. The demurrer was sustained, but on appeal the order was reversed. *Peurifoy v. Mauldin,* 142 S. C., 7, 140 S. E., 253. A reply was then filed by the National Surety Company to the answer of the American Surety Company, denying the material allegations thereof.

The case came on for trial before his Honor, Judge Mann, and a jury, at February term, 1928. In the meantime, on April 3, 1927, the defendant Mauldin had died, and the defendant Loyal qualified as administrator of his estate.

The trial resulted in a verdict in favor of the plaintiff, for $35,252.23 against the defendant Loyal, as administrator, and the defendant American Surety Company, and in favor of the defendant National Surety Company.

A motion for a new trial upon the minutes was made on behalf of the American Surety Company, and a similar motion on behalf of the administrator Loyal. Both motions were refused.

The defendant American Surety Company has appealed from the judgment entered upon the verdict upon exceptions which will be later considered.

After the rendition of the verdict and the refusal of the motions for a new trial, his Honor, Judge Mann, signed a consent order, dated March 7, 1928, as follows:

"ORDER

"In the above-entitled cause, since the trial and rendition of the verdict, it appears that a number of questions have arisen as to certain collaterals and securities which were placed with the Receiver of American Bank & Trust Company, and also some question as to the amount in the hands of National Surety Company and to whom it should be paid; and that it is necessary to make additional parties.

"It is, therefore, by consent of all counsel present in open Court, ordered:

"1. That Miss Ivy Mauldin, Southern Motor Company and J. B. Bostick be made additional parties to this action, and that the supplemental complaint be forthwith served upon them; and that they and all other parties to this action be authorized and empowered to serve and file within twenty days from this date such additional pleadings as they may be advised are proper.

"2. That all issues arising herein be referred to the Master of Richland County to take and hear all evidence offered in regard thereto, and to make and report his findings and conclusions of law and fact to this Court with all convenient speed.

"Let a copy of this order be served with the supplemental complaint on the additional parties provided for therein."

Accordingly the Receiver filed a supplemental complaint, making Miss Mauldin, Southern Motor Company, and J. B. Bostick parties defendant, bringing up the questions suggested in the order of his Honor, Judge Mann.

These defendants and the original defendants answered the supplemental complaint; testimony was taken by the master who made his report, to which the plaintiff and the American Surety Company filed exceptions. The matter came on before his Honor, Judge Townsend, who filed decree, dated July 17, 1928, to which the American Surety

Company and the National Surety Company have filed exceptions.

It thus appears that there are two separate and distinct appeals in one, a fact which necessarily required separate treatments of: (1) The appeal of the American Surety Company from the judgment in the jury trial, against it; and (2) the appeal of the two surety companies from the decree of his Honor, Judge Townsend, in the matter which was referred to the Master.

## Appeal No. 1

*The appeal of the American Surety Company from the judgment in favor of the Receiver against it, for $35,252.-23.*

The evidence, undisputed as we think, tends to establish the following facts:

In the latter part of February, 1926, about four months before the American Bank & Trust Company closed its doors, the defendant Ivy M. Mauldin, then president, and J. Pope Matthews, then chairman of the board of directors, were each separately engaged in a controversy with the federal government, in reference to their personal income taxes, involving in each instance, some $25,000; the department had ruled against them, and they desired to have its decision reviewed on appeal. An appeal bond was required of each, and, before it could be signed by a surety company, it was necessary that federal securities be deposited with the surety company as collateral or indemnity. The bond had to be filed in Washington by Tuesday, February 23, 1926. The 20th was Saturday; the 21st Sunday, and the 22d Monday, Washington's Birthday, a legal holiday. The climax of urge was on Saturday the 20th; they had to obtain the necessary securities to pledge with the surety company, on that day. They did not personally have them, and this scheme was devised; they would negotiate with the First Caro-

linas Joint-Stock Land Bank, *in the name of the bank* of which they were the leading spirits, the purchase of land bank bonds to the amount of $61,000, $30,000 of which would be used by Mauldin and $31,000 by Matthews for the purpose indicated.

Accordingly, on Saturday, February 20, 1926, in the forenoon, both Mauldin and Matthews *at different times,* approached the officers of the land bank with the proposition of purchase. Matthews gave as a reason for wanting the bonds: "That he thought he had an opportunity to sell * * * to some of his country correspondent banks and * * * he might make a little profit on the transaction"; Mauldin: "That he wanted the bonds for the purpose of clearing some deposit either for state or county"—both of them thus studiously camouflaging their real object in obtaining the bonds.

It was proposed by Mauldin, and agreed to by the land bank, that the bonds were to be paid for by the American Bank & Trust Company passing to the credit of the land bank, upon the books of certain banks with which the land bank did business, several amounts making up the total purchase price of $62,844.62.

Accordingly by telegraph and telephone, the land bank was given credit in the several banks as agreed, and the following statement was given to Mauldin and Matthews by the land bank:

"February 20th, 1926.

"American Bank & Trust Company, Columbia, S. C., Gentlemen: We hand you herewith bonds Nos. M300101 to M300161, inclusive, dated Feb. 1, 1926, of our bank for $1,000 each, totalling $61,000.

"The above bonds are sold on basis of 103 less the usual 1/4% banker's discount and accrued interest from Feb. 1, 1926, at the rate of 5%.

```
Par value of bonds .....................$ 61,000.00
Premium ...............................    1,677.50
Interest for 20 days ...................      167.12
                                        _____
    Total .....'......................$ 62,844.62
```

"We understand that you have completed arrangements that our account is being credited today as listed below in the following banks who have agreed to take credit at your bank for a like amount:

```
First National Bank of Batesburg ..........$ 10,000.00
First National Bank of Bishopville ...........  10,000.00
National Exchange Bank of Chester .........  10,000.00
Merchants & Planters Nat. Bank of Gaffney ..  10,000.00
Citizens Bank & Trust Co., Rock Hill ........  10,000.00
First National Bank of Springfield ..........   5,000.00
National Bank of Leesville ................    7,844.62
                                           _____
    Total ..............................$ 62,844.62
```

"Settlement for above bonds is being made by us today direct with Harris, Forbes & Co., of New York.

"It is requested that you will sign the copy attached hereto as confirmation of the agreement.

"Yours very truly,

"President.

"L/2

"The above understanding is correct.

"The American Bank & Trust Company,
"By I. M. Mauldin."

(Note.—It will be observed in passing, that none of these outside banks were in debt to the American Bank & Trust Company, but it was agreed that they should be credited upon the books of the American Bank & Trust Company, with the several amounts in consideration of the respective amounts credited by them to the Federal Land Bank.)

Late Saturday afternoon then, the officers of the land bank, having been assured by the several outside banks that credits had been entered according to the foregoing agreement, met with Mauldin and Matthews and representatives of the National Surety Company (which was expected to sign the separate appeal bonds of Mauldin and Matthews), at the office of the American Bank & Trust Company. The officers of the land bank had brought with them bonds in the amount of $61,000, 61 bonds of $1,000 each. The bonds were counted and delivered to the representatives of the National Surety Company, who placed them in a vault deposit box in the bank, and went out to procure the necessary signature of another representative of the surety company upon the appeal bonds. This was accomplished, and the appeal bonds were delivered severally to Mauldin and Matthews, who made use of them for the purposes above indicated.

(Note: It will be observed that, up to this moment, not a thing of value had passed from Mauldin and Matthews for the bonds which they had acquired and delivered for their respective uses to the National Surety Company. They had been purchased ostensibly by and for the bank, and solely upon its credit; nothing in fact passed from the bank other than its deposit obligations to the several outside banks with which credits had been established in favor of the land bank.)

All of these transactions took place on Saturday afternoon when the bank was closed for the day, and without the knowledge of any other officer or director of the bank. Mr. Way and Mr. Lever, officers of the land bank, only knew, as they supposed, that they were selling their bonds to the bank. *The real purpose on the part of Mauldin and Matthews in the acquisition of the bonds, was not only not disclosed to the officers of the land bank, but they were deceived and misled as to the real purpose.* Mr. Coleman and Mr. Maher, representing the National Surety Company, only knew that

they were receiving the bonds of the land bank, which they supposed belonged to Mauldin and Matthews; the receipts or statements offered in evidence signed by Mauldin, delivered to the land bank and to the surety company, so stated.

These transactions took place, as stated, on Saturday, February 20th, having been concluded about dark in the evening. Nothing was communicated by either Mauldin or Matthews to any other officer of the bank for about 10 days, in reference to the transaction. Manifestly, however, they were conscious of the irregularity, to say the least, of their conduct, and realized the necessity of reporting it to the finance committee for such approval as they, at that late day, could afford; it could not be indefinitely or longer concealed.

The finance committee held a meeting on March 1st, which Mauldin, Matthews, Byrd, and DuPre, all directors and members of the committee, attended; the fifth member, Miller, was absent.

Byrd testified that at that meeting they had completed all of their business and had started to leave when Matthews or Mauldin told him: "We have used some of the bank's bonds, and we want to bring it before the finance committee * * * it was that they had used the bonds * * * just wanted them temporarily * * * not over a week or ten days and will return them. * * * They did not tell when they took the bonds, said they had used them." About 10 days or two weeks later, that he asked Mauldin: 'How about those bonds and the security you were to put against them?' And he said 'that has all been fixed, and by the way, here is a letter from Mr. Bradley.' Took it out and read that letter in which it stated that ample security had been placed in place of those bonds that had been taken out. * * * I never saw any securities put up in place of the bonds. I did not discuss it with the other directors outside of the finance committee. * * * I did not report it to any one."

(Parenthetically it may be stated that in his testimony Bradley, the bank examiner, denied the authenticity of the letter exhibited by Mauldin to Byrd.')

DuPre, the remaining member of the finance committee, gives his version of it. His description is strongly corroborative of Byrd but somewhat more vivid: "Mr. Mauldin was sitting on my right * * * and said 'you know Matthews has been sick in the hospital, and the time has come when we have got to do something, so temporarily we had to put up a bond * * * for the government for these revenue taxes due the government,' and I do not know the exact words now that he said, but Mr. Mauldin then said, 'we took, borrowed or exchanged,' I do not know what he used, * * * but he conveyed the idea that *they had taken some bonds from the bank and used them* to put up for a surety bond to the government. * * * 'Yes, but it is only a temporary proposition, just a matter of a few days. * * * We took these things from here and we will put them back, and in the meantime we will put up security to secure the bank if any loss occurs.' * * * The impression I got was that it was a temporary taking or borrowing, *but it did not appear to me to be regular.* I thought the original would be put back. I talked to Matthews several times, don't think I talked to Mauldin. Marthews told me several times that everything was all right."

Notwithstanding their knowledge of what *had been done,* Byrd and DuPre both voted for the adoption of a resolution, prepared by Byrd, purporting to *authorize* what they both knew had already been accomplished. The resolution was as follows, as it appears upon the minute book of the finance committee: *"Permission* granted to J. Pope Matthews and I. M. Mauldin *to borrow* from Bond Department of Bank $30,000.00 and $31,000.00 *respectively.* The said J. Pope Matthews and I. M. Mauldin to place with the Bond Department of Bank their personal obligations, such as shall be acceptable to State Bank Examiner, in place of said bonds

so borrowed, the said bonds borrowed to be used temporarily as collateral against bond furnished by the National Surety Company on behalf of the said J. Pope Matthews and I. M. Mauldin and in favor of John F. Jones, Collector of Internal Revenue."

In addition to this, the plaintiff offered the testimony of C. M. Earle, cashier of the bank, to show notice to him, as cashier, of the alleged criminal act. Earle had no knowledge of the bank acquiring the bonds or of Matthews or Mauldin using them. Nor did he have knowledge of the entries in the books. These entries seem to have been made under the instruction of Mauldin and without conference with the cashier. Several weeks after the occurrence Byrd asked the cashier if he ever examined the minutes of the finance committee. After they had been written up, Earle looked at them and found what Byrd was referring to. He testified: "Mr. Mauldin was President, Mr. Matthews was Chairman of the Board. Neither of them discussed it with me at any time. * * * I never saw the stock and bonds that corresponded with the item. * * * The bonds were never put back in the bank before it closed. * * * *The stocks and bonds were never charged on our books to any individual and I never saw any securities put in there. As far as I know there was nothing in the assets of the bank to show for the $61,000.00 of stocks and bonds except the entries on the books."*

Earle testified further, that it was not his duty to put it down in the books; that it was not customary to turn the bonds over to him; "when I saw it (the minutes), I saw where the Finance Committee had approved the loan conditioned upon them putting up collateral satisfactory to the Bank Examiner in lieu of these bonds. I passed that up—did not consider it anything wrong. I felt that as the Finance Committee was part of the Board it was up to them. Q. And it was entirely—so you consider that the transac-

tion was all right and you continued on in your capacity as cashier of the bank? A. Yes, sir. * * * The bond department was actively in the hands of Mr. A. C. Heyward and not directly in my charge. * * * It not infrequently happens in banking matters that temporary arrangements are made lasting over a few hours or a few days. I had known Mr. Mauldin ten or twelve years. He was a brother of Judge Mauldin and Col. Mauldin. Prior to this transaction I had not found him engaged in questionable dealings. I had absolute confidence in Mr. Mauldin."

At some time, not definitely fixed, but before the collapse of the bank on June 26th, Mauldin exhibited to the bank examiner a list of securities hereinafter set forth as Exhibit A, in which he acknowledged to have "received" the bonds which "are *to be* used as collateral, to secure from the National Surety Company, *on my behalf,* a tax abatement bond, running in favor of John F. Jones, Collector of Internal Revenue," and declaring: "In the place of these bonds I have sold and delivered to the bank the following securities" —listing them.

This paper was dated February 20th, the very day of the appropriation, but evidently was not shown, or even executed, until some time after March 1st, as it apparently was exhibited to Bradley in a feeble effort to comply with the conditions of the resolution.

The evidence shows that none of these securities were ever delivered to the bank. After the bank examiner took possession of the bank they were delivered by Mauldin to him, as will later appear. All of them, with the exception of the stock of Southern Credit Company and note of Southern Motor Company, proved entirely worthless.

At the close of all the evidence the American Surety Company made a motion for a directed verdict upon the following grounds:

"1. That the only inference which can reasonably be drawn from the testimony is that Mauldin took and used

the Land Bank bonds without criminal intent or purpose to appropriate or defraud the bank of said bonds;

"2. Because the undisputed evidence shows that he use of the said bonds having been brought before the said Finance Committee of said bank, which was charged with authority to act in such matters, such committee ratified the action of said Mauldin in taking and using the same and permitted the putting up and acceptance of other obligations and securities in lieu of the ones used, which was done;

"3. Because the undisputed evidence shows that after the discovery by the bank through its officers and agents of the alleged criminal act by Mauldin, if any existed, (1) notice was not given to the Bonding Company within ten days after such discovery, and (2) proof of loss was not furnished within three months after such discovery as required by the terms of the policy."

The motion was refused.

The refusal of the motion upon the first and third grounds is made the basis of exceptions; the second ground has not been pressed.

The foregoing recital of the facts, in our opinion, amply justifies the action of his Honor, Judge Mann, in refusing the motion for a directed verdict upon the first ground. As a matter of fact, no other conclusion can be legitimately inferred from the evidence than that the conduct of Mauldin was a flagrant breach of trust, the conversion of assets of the bank to his personal use, and legally a breach of trust with fraudulent intent. See *State v. (Shirer) Shiver*, 20 S. C., 392. His manifest consciousness of a violation of the criminal statute relating to loans and the circumstances of personal pressure, haste, concealment, and deception, with the other circumstances related above, cannot be otherwise construed.

The refusal of the motion for a directed verdict, upon the ground that the undisputed evidence shows that, after the discovery by the bank of the alleged criminal act of Maul-

din, proof of loss was not furnished to the surety company within three months thereafter, as required by the terms of the bond, does not appear to have been discussed by the appellant.

I think that the defendant's motion for a directed verdict should have been granted upon the ground that the undisputed evidence shows that, after the discovery by the bank of the alleged criminal act of Mauldin, notice of the loss was not given to the surety company within ten days thereafter, as required by the terms of the bond.

The bond provides:

"Section 16. This bond is subject to the following express conditions:

"At the earliest practicable moment and at all events not later than ten days after the insured shall discover any loss hereunder, the insured shall give the Underwriter notice thereof by registered letter or telegram, addressed to it at the Home Office, and shall also within three months after such discovery, furnish to the Underwriter at its Home Office, proof of loss with full particulars."

The evidence in my opinion permits no other reasonable inference than that the bank at least three months before its collapse, had notice of the embezzlement by Mauldin of $30,000.00 of bonds obtained upon the credit of the bank, and therefore belonging to the bank, which he converted to his own use.

The plaintiff cannot now take the position that the act of Mauldin was an innocent one, after basing his complaint upon the allegation that on *February 20, 1926* (the day the bonds were misappropriated), the defendant Mauldin, while a salaried officer and employee of the bank, committed a breach of trust with fraudulent intent, in that "he secretly took and embezzled and converted to his own use, moneys and securities of said bank, to-wit, bonds of First Carolinas

Joint Stock Land Bank, of the value of $30,000.00," and asking for the value of the bonds appropriated by Mauldin.

The evidence shows that the finance committee had knowledge of the act which has thus been characterized by the plaintiff; that the cashier of the bank had knowledge of it; and that the chairman of the board of directors and two members of the board had knowledge of it, and kept it concealed from the surety company, which necessarily was deeply interested in such a transaction.

In reference to the finance committee, the by-laws of the bank provide: "Section 9. Finance Committee. The Board of Directors shall appoint a Finance Committee consisting of the Chairman of the Board, the President of the bank, and not less than three nor more than five other members, which Committee shall be a part of the permanent organization of the bank, and shall in the interim between the meetings of the Board of Directors, exercise power of the Board in accordance with the general policy of the bank and the Board of Directors."

The finance committee is thus charged with the powers of the board of directors during the interims of their meetings, and required to keep a record of its meetings, open to the inspection of the board. At the time of the meeting of March 1st, at which Mauldin and Matthews disclosed the fact of their appropriation of the bonds, the finance committee was, for all purposes within the jurisdiction of the board, *the board of directors,* and if, in that meeting, knowledge of the alleged criminal act of Mauldin and Matthews was conveyed to the committee, unquestionably such knowledge was imputable to the bank.

It cannot be denied that at that meeting of March 1st the finance committee was functioning as such, about the business of the bank. Mr. Byrd testified: "We had finished *the other business coming before the Finance Committee,* and started to go out." That either Mauldin or Matthews said:

"By the way, *we have another matter we want to take up with the Finance Committee.* * * * We have used some of the Bank's *bonds and we want to bring it before the Finance Committee.* * * * Mr. DuPre remarked, 'Well, in what way have you used them?' * * * He said, 'We have put them up as collateral against some bond that they proposed to give to the government in some income tax matter.' Mr. DuPre remarked, 'Well, Mr. Matthews, *that is a very irregular transaction.*' 'Well,' he said, *'we want the Finance Committee to take some action on it.*'" That after studying over it a while, he (Byrd) prepared the resolution which was adopted as set forth above, thinking, as he testified, that "the best thing we could do was to try to get security placed back into the assets of the bank, of equal value of the bonds which they had used."

DuPre gives practically the same account; he thought it irregular, was "shocked," but agreed to the resolution submitted by Byrd. There can be no doubt then that they were about their "master's business," a matter clearly within their functions as a finance committee.

But it is ingeniously insisted by the plaintiff, respondent, that both Mauldin and Matthews were personally interested in the bond transaction, and that they must be counted out of the quorum of four then transacting the business of the finance committee, leaving only DuPre and Byrd, less than a quorum, present, and that therefore the notice to the finance committee was nothing more than notice to the individual directors other than the alleged malefactors.

The suggestion is an effort to apply a perfectly sound legal proposition to a situation to which it is not at all appropriate. It is well established that, where a board or committee proposes, in breach of its trust, to consummate a transaction which will be to the personal benefit of one or more of its members and to the detriment of the corporation, those members who are personally interested in the scheme cannot be counted to make up a quorum. This is en-

tirely just and right. The principle would doubtless invalidate the resolution of the finance committee which purported to authorize Matthews and Mauldin *to borrow* $30,000.00 and $31,000.00, respectively, from the bond department of the bank, for they were both directly interested in its adoption. If the validity of that resolution were in question, the principle would apply. But that is not the matter under discussion; it is one of *notice* to the corporation, through the finance committee which represented the board of directors, in fact, for the time being, *the board,* of a deplorable act of breach of trust, *characterized by the complaint* as an embezzlement, a breach of trust with fraudulent intent, a conversion of the property of the bank, consummated under circumstances of personal pressure, haste, secrecy, concealment, and deceit.

The leading opinion is replete with authorities sustaining the well-recognized and undoubted proposition that an interested director or committeeman cannot be counted to make up a quorum, to pass upon any matter in which he is interested. The principle is applicable where some definite action is to be taken by the body, consummating a transaction which will bind the corporation. The theory is that the corporation is entitled to the honest disinterested judgment of each member of the body, which of course cannot be secured when "self the wavering balance holds."

In the present instance Matthews and Mauldin were giving information as to the bond transaction, in expectation doubtless that the committee would ratify what they had so improperly done. That information necessarily preceded the adoption of the resolution. The resolution came within the inhibition of the principle above recognized and could not have been legally passed, but the invalidity of the resolution could not possibly have wiped out the fact that the committee, as then legally constituted, had received the information. As a matter of course the knowledge of Mauldin, concerning the transaction in which he was so involved,

could not be imputed to the corporation which he represented; but when, as a member of the committee, he gave them information of what he had done, it was not in his interest that he opened up, rather the contrary. We see no ground for holding that by this conduct he disrobed himself of his membership of the committee and broke the quorum. As well might it be said that an innocent director, in giving notice of an irregular act on the part of all of the other individual directors, could not thereby give notice to the entire board, because of the supposed disqualification of the impeached directors, reducing the board of membership to the sole impeaching director.

Another reason: While Mauldin and Matthews appear to have co-operated in the malodorous scheme, at its conclusion they separated, one taking $30,000.00 of the bonds and the other $31,000.00. Thereafter each tub stood upon its own bottom, and they were so treated in the resolution adopted by the finance committee who regarded each as a separate borrower. Matthews was therefore not disqualified so far as notice of Mauldin's conduct was concerned, nor Mauldin of Matthews'.

Now then, consider the character of the information received by the finance committee and the circumstances connected therewith:

When they met on March 1st, nine days after the misappropriation, they were entirely without knowledge of the transaction by which the credit of the bank was pledged for the personal benefit of Mauldin and Matthews. They must have been impressed with the belated disclosure, at the close of their meeting, as they were about to disperse. It is not conceivable that a more important matter than the abstraction of $61,000.00 of the bonds of the bank could have been called to their attention, and why it should have been postponed until the fag-end of the meeting can only be explained by the reluctance of the malefactors to disclose a disagreeable incident and their effort to seek cover.

Byrd and DuPre, the only barriers between the bank and its unfaithful officers, were informed of a most astounding irregularity, the dissipation, at least for the time being, of a substantial part of the assets of the bank; Byrd was amazed at the "irregularity," and DuPre was "shocked"; and yet, after they had been informed that the bonds had been actually appropriated and pledged to an innocent party, for the personal ends of the participants, one of them prepared a resolution and the other agreed to it, giving the transaction the face of an *authorization,* a permission to "borrow" the bonds upon certain conditions to be performed, when they knew that the bonds had already been appropriated and the performance of the conditions left to the will of wrongdoers. They made no report of the transaction to anyone connected with the bank, in an apparent effort to shield Mauldin and to prevent any unfavorable comments upon the management of the bank. They made the most cursory efforts to be assured that the conditions of the resolution had been complied with; satisfied with the statements of Mauldin and Matthews that the matter had been "all fixed up." If, with the knowledge they had of the transaction, they had inquired of the land bank, they would have learned that both Mauldin and Matthews had deceived the land bank as to the purpose of acquiring the bonds and for whom they were being acquired. If they had inquired of the cashier, they would have learned that, although the outside banks had been credited with deposits aggregating $61,000.00, not a dollar or a dollar's worth of assets was deposited by these banks to represent those deposits, and that there was an absolute shortage of $61,000.-00 in the assets of the bank. The fact that the members of the finance committee other than Matthews and Mauldin understood the character of the act of criminal appropriation of the bonds is demonstrated by the obviously misleading terms of the resolution. They would not have attempted to cover up what they thought was a perfectly honest trans-

action, honestly consummated, with the cloak of an *authorization* to do what they knew had already been done.

The cashier, C. M. Earle, learned of the action of the finance committee in reference to the bond transaction, several weeks after March 1st, by reading the minutes of the meeting of that date. If his information was sufficient to notify him of criminality on the part of Mauldin and Matthews, and was received within the course of his employment, we doubt not that notice to him was notice to the bank.

We think that it has been settled by the opinion of this Court in the case of *Equitable Trust Co. v. Bank,* 145 S. C., 91, 142 S. E., 811, 818, quoting Fletcher, Corp., § 2216; "Notice given to the cashier of a bank, or to the president of a bank or other officer or agent having general supervision and control over the management of its business, or to any other managing officer or agent, as to any matter within the scope of his authority, is notice to the corporation, whether it is communicated to the directors of the corporation or not."

It seems clear that the cashier had knowledge of the alleged criminal act of Mauldin, or of facts sufficient to put him on the inquiry—an inquiry which it was his duty to pursue and which if pursued would have developed all of the circumstances of criminality appearing.

Indeed, we do not think that it was essential to the breach of the bond that the act of Mauldin be shown to have been infected with a positively criminal intent. By its terms the bond undertook to indemnify the bank against "any dishonest act" of any of the employees of the bank. Regardless of Mauldin's claimed intention to return the bonds appropriated by him or to indemnify the bank from loss on account of his unauthorized appropriation of them, his act was a dishonest one. A fiduciary commits a moral wrong, a dishonest act, in appropriating the money or property of his beneficiary, although at the time he has no intention of stealing it, but intends, *if able,* to restore it. Hundreds of

beneficiaries have been ruined by such a policy, and it will add nothing to the enforcement of moral integrity of trustees for the Court to do otherwise than stamp such conduct with its emphatic disapproval. That the finance committee and the cashier had notice of such dishonest act there cannot be the shadow of a doubt.

He (the cashier) read the minutes of the finance committee and learned of the transaction. He knew that it was irregular, and that the resolution was a camouflage and presented an untrue aspect of it; he knew that nothing had been put up by Mauldin; that there was not even an entry upon the books charging the bonds to any one; that no securities had ever been filed with the bank for the abstracted bonds; that not a director, outside of the finance committee, knew anything of the affair; that the outside banks had deposited nothing to account for the credits given to them upon the books of the bank, all of which was subject to their checks and possibly withdrawn. This condition subsisted for three months prior to the collapse of the bank; and it was only after the bank examiner took charge that the real situation was developed, and the promised securities delivered to him. The by-laws provide: "The Cashier shall be the chief executive officer of the Bank and have general supervision of the clerical force and be responsible for the proper keeping of all records and safeguard all of the moneys, securities and properties of the Bank."

In reference to the matter of notice to the two directors, Byrd and DuPre: They received notice of the improper appropriation of the bonds while they were attending a meeting of the finance committee, actually transacting the business of the bank. The facts with which they became acquainted by the statements of Mauldin and Matthews directly and very nearly affected the interests of the bank and were communicated to them for action by the committee. Under these circumstances it seems clear that notice to them was notice to the bank.

In 4 Fletcher, Cyc. Corp., § 2216, it is said: "And notice given to a single director officially has been held notice to the corporation." Citing *Boyd v. Chesapeake & O. Canal Co.,* 17 Md., 195, 79 Am. Dec., 646; *United States Ins. Co. v. Shriver,* 3 Md. Ch., 381; *Bank of United States v. Davis,* 2 Hill (N. Y.), 451.

In the *Boyd* case it was held, quoting syllabus: "Notice to two officers and directors of corporation, given them in an official capacity, is notice to the corporation, even though they fail to communicate such notice to any of the other directors."

In *Smith v. South Royalton Bank,* 32 Vt., 341, 76 Am. Dec., 179, it was held, quoting syllabus: "Notice to bank director who is acting on behalf of the bank is notice to the bank."

We think a few moments' reflection will show the vital importance of notice to the surety company. As set out by the witness Maher, the company receiving such notice would have made immediate demand upon Mauldin for restitution. At the time when notice might have been given, to wit, March, 1926, the American Bank & Trust Company was still regarded as entirely solvent, and the stock was worth par. Mr. Mauldin had a large amount of this stock and could doubtless have hypothecated it for a sum sufficient to make restitution. If the notice came to the cashier and directors, they had two perfectly definite courses to pursue. They might have given notice to the surety company and to their associates and called on Messrs. Matthews and Mauldin to restore the property, in which case it probably would have brought about a disagreeable situation in the bank, and, if knowledge had gotten out about it, might have injured the credit of the bank, as the officers had done a very irregular thing, as Mr. DuPre stated. This course would of course have protected the surety. On the other hand, the cashier and the directors may have taken the course of raising no objection and tacitly approving the transaction, hoping that same would result

in no loss to the bank, and in this way save the bank from any question concerning the transaction of its officers. The latter course, if the bank was to survive, would certainly have been better for it. They may have taken this course, which was unquestionably fraught with great jeopardy to the bonding company. Later the bank failed. If they acted in what they conceived to be their own interest and the interest of the bank at the time, they cannot now come back on the surety company and make claim against it if they failed to give the notice required by the bond.

The proposition is advanced in support of the affirmance of the judgment against the surety company that: "The general rule that knowledge or information communicated to an agent or officer of a corporation, is notice to the corporation, which is announced by this Court in *Equitable Trust Co. v. Columbia National Bank,* 145 S. C., 91, 142 S. E., 818, *is not applicable to fidelity and surety bonds.*" (Italics added.) Quite an array of authorities is cited in support of this proposition, not one of which, in my opinion, has that effect. In other words, it is proposed to be announced as the law of this State that, because a defendant may happen to be a surety company for compensation, it is not entitled to the consideration given to every other defendant, individual or corporate, and is not entitled to the benefit of an express condition in the written contract between the parties.

It is declared in the leading opinion: *"The contract was not made for the purpose of protecting the Surety Company in any dealings it might have with the bank,* but on the contrary the Surety Company undertook to protect the bank in the matter of delegating to Mauldin, its president, some of the duties it owed to others."

It is difficult to apprehend why both of these purposes may not be accomplished by the policy. The company undertook, of course, to so indemnify the bank, but I fail to see why, in incurring that obligation, it may not, *for its protection* against the claim of the bank have provided a reason-

able condition which the bank must comply with, in order to perfect its claim of indemnity.

The opinion further declares: "The Surety Company contracted to save the bank from loss on account of any dishonest act wherever committed by reason of its trusting the President with his duties. The bank did not undertake nor agree that the other officers and employees of the bank would be faithful to their trust. Notice to or knowledge of the Cashier, or an individual director in case of fidelity bond of employees, is not imputable to the bank, and his laches or failure to communicate it to the Board of Directors, or to the Surety Company, does not release a fidelity surety bond. The fact that there were other unfaithful officers and agents of the corporation, who knew or connived at the infidelity of the President of the bank, ought not, in reason, and does not, in law or equity, relieve the Surety Company from responsibility for his alleged dishonest act." All of which is perfectly true so far as it declares that a bank cannot be charged with the negligence or connivance of certain officers other than the defaulting ones; it is plainly erroneous, in declaring: "Notice to or knowledge of the Cashier, or an individual director, in case of fidelity bond of employees, is not imputable to the bank, and his laches or failing to communicate it to the Board of Directors, or to the Surety Company, does not release a fidelity surety bond."

The principle that a bank cannot be charged with the negligence or connivance of certain officers other than the defaulting ones is in substance the ruling in all of the authorities cited. It is wholly beside the mark in the present case. The surety company is not seeking immunity from its obligation because of any neglect or connivance of some other employee in the bank, who may have known of and connived at the fraudulent act of the president. It is claiming immunity because of the written contract which is the basis of its obligation, and which contains a provision, in the nature of a condition, requiring that it be given notice

of a discovery of the loss for which the insured claims indemnity; that notice of such loss was directly traced to the finance committee, acting as the board of directors, to the directors individually, and to the cashier.

It seems obvious that the author of the opinion has failed to apprehend the difference between an effort to relieve the surety company because of a negligent breach of duty on the part of some other than the defaulting officer, and the right of the surety company to stand upon the express condition of its contract that notice of the loss be promptly given to it.

The error is plainly demonstrated by a consideration of the facts and the conclusions of law in the case of *Fidelity & Deposit Co. v. Courtney*, 186 U. S., 342, 22 S. Ct., 833, 841, 46 L. Ed., 1193, so strongly relied upon in the opinion. In that case the first issue presented was whether the receiver had complied with the requirement of immediate notice after discovery of the defalcation of the cashier. *It was conceded that knowledge of the wrongful act had been received by the receiver.* The Court held upon this issue that it was a question of fact for the jury, whether the receiver, after this knowledge, had within a reasonable time given notice. The next issue was whether the surety company was discharged by reason of the knowledge or connivance of the vice president of or in the act of the defaulting officer, which should be imputed to the bank. Upon this issue the Court held that, even if such knowledge as that of the corporation could relieve the surety company, it was not imputable through that of certain officers, to the bank. That this was the main issue in the case appears from the holdings of the Court: "It is well settled that, in the absence of express agreement, the surety on a bond given to a corporation, conditioned for the faithful performance by an employee of his duties, is not relieved from liability for a loss within the condition of the bond by reason of the laches or neglect of the board of directors, not amounting to fraud or bad faith,

and that the acts of ordinary agents or employees of the indemnified corporation, conniving at or co-operating with the wrongful act of the bonded employee, will not be imputed to the corporation"—citing many cases. The cases cited are to the same effect and show that the question of notice, *under the condition of the policy,* was not that at issue; but rather that such knowledge was not imputable to the bank, *in order to establish its negligence,* to the extent of relieving the surety company; not upon the issue at stake in the present action.

The quotations from Morse simply are a reiteration of the principle; they do not at all relate to the question of notice; for instance: "No act of the President or Directors, in violation of their duty *to the stockholders,* can discharge the surety on the bond of a bank officer." This has no application to a breach by the bank of its obligation under the contract to give notice to the surety company of a defalcation; that is a duty which it owes to the surety company, *not to the stockholders,* after knowledge traced to it through the certain channels referred to. I apprehend that no one would contend under this doctrine that knowledge acquired by the president or board of directors, all innocent of participation, would not be the knowledge of the bank which had to be communicated to the surety company, if the policy so required.

In *Phillips v. Bossard* (D. C.), 35 F., 99, cited in the extract from Morse, no question arose as to any clause requiring notice. The case simply holds that, under a fidelity bond, the surety company cannot claim exemption upon the ground of negligent lack of watchfulness on the part of the president and directors, as the bond did not provide for such exemption and no question of notice arose.

I cannot too emphatically stress the difference between the *imputation* to the bank of the knowledge which Mauldin acquired as a participant in the questionable transaction, and the transmission of *information* in reference to it which he

communicated to the finance committee. The first is rejected
for the reason that he is presumed not to have communicated
to his principal his connection with a transaction in his own
interest and to the detriment of his principal. The second
should be received for he is actually conveying the informa-
tion which under the other conditions he is assumed to be
witholding. If a director, not a member of the finance com-
mitee, or a stockholder, or an entire stranger, had appeared
before the finance committee and had opened up the whole
transaction, with Mauldin and Matthews sitting there as
members of the finance committee, would it not be a remark-
able conclusion that as soon as he opened his mouth Mauldin
and Matthews would assume the form of impalpable spirits,
melted into thin air and left Byrd and DuPre the sole con-
stituents of the committee? When Mauldin gave his account
of it, which was a narrative, and not a palliative, argu-
mentative account by way of excuse, he was addressing Du-
Pre, Byrd, and Matthews, a majority of the committee, and
so with Matthews. That was no committee action in the in-
terest of a malefactor, disrobed as a committeeman on ac-
count of his participation in that which he was narrating.

Conceding, however, the correctness of his Honor's order
refusing the motion for a directed verdict, there was unques-
tionably error in the charge to the jury, as assigned in the
third exception: "Because his Honor, the trial Judge, erred
in holding and charging the jury that notice or knowledge
could be brought home to the bank of the loss of the bonds
only by making the same known to the directors of the said
bank as a body; whereas he should have held and charged
that notice to an officer or representative of the bank,
charged with the care and custody of its property, would
amount to notice and knowledge of the bank as affecting the
rights of the surety company (and require the giving of
notice within ten days in accordance with the terms of the
surety bonds) and that the failure to so hold and charge
was error."

There is not a particle of evidence tending to show that notice of the alleged criminal act of Mauldin was brought home to the board of directors, *as a body,* at any time prior to the collapse of the bank. That being true, the effect of the charge was to completely eliminate the defense of the surety company, based upon the failure of the notice required by the terms of the bond.

The crucial question is: Was there sufficient evidence to require a submission of the issue to the jury that knowledge of the *act* of Mauldin was communicated to the finance committee at its meeting on March 1st, or later to C. M. Earle, cashier, while acting within the course of his employment? Of course, if they, or either of them, had knowledge of such facts as would have put a reasonably prudent person upon inquiry, it will be assumed that they had knowledge of such facts as that inquiry would have developed. If there was no such sufficient evidence, it is clear that the charge *that knowledge must have been brought home to the board of directors as a body,* though erroneous, could have worked no harm to the surety company, for the burden was upon it to bring notice home to the bank, and the only avenues claimed to have supplied the essential evidence were alleged notice to the finance committee and to Earle, the cashier.

If there was such evidence, it is equally clear that the charge was seriously prejudicial to the surety company in absolutely annihilating its defense based upon the failure of the bank to notify it of the defalcation as required by the bond.

The ruling excluded notice to the finance committee, notice to the two directors other than Mauldin and Matthews, and notice to the cashier, as to all of whom there was evidence of actual knowledge, certainly of facts which should have put them upon inquiry.

It clearly was at least a question for the jury whether the finance committee, other than Mauldin and Matthews, had knowledge of the alleged criminality of Mauldin, or of facts

sufficient to put them on inquiry; an inquiry which it was their duty to pursue, as there was no one else to protect the interests of the bank, or to do justice to the company that stood sponsor for the integrity of its officers.

If the proposition advanced by the presiding Judge be sound, then, under the circumstances here presented, there would have been no official or body connected with the bank, however "high his title," who could have received such knowledge or information as would have imposed upon them the duty of extending it to the surety company.

It is suggested that, even if knowledge on the part of the finance committee, of the directors, or of the cashier, could be so imputed to the bank as to require the extension of notice thereof to the surety company, it appears that at that time there had been no loss which could have been reported; that the knowledge acquired was simply of a transaction which the officers named did not consider one of turpitude.

A sufficient answer to this suggestion is the syllabus of the Court in the case of *American Surety Co. v. Pauly*, 170 U. S., 133, 18 S. Ct., 552, 42 L. Ed., 977: "Under the condition of the bond in this case, requiring notice of acts of fraud or dishonesty, the defendant was entitled to notice in writing of any act of the cashier which came to the knowledge of the plaintiff of a fraudulent or a dishonest character as soon as practicable after the plaintiff acquired knowledge; and it is not sufficient to defeat the plaintiff's right of action upon the policy to show that the plaintiff may have had suspicions of dishonest conduct of the cashier; but it was plaintiff's duty, when it came to his knowledge, when he was satisfied that the cashier had committed acts of dishonesty or fraud *likely to involve loss* to the defendant under the bond, as soon as was practicable thereafter to give written notice to the defendant; though he may have had suspicions of irregularities or fraud, he was not bound to act until he had acquired knowledge of some specific fraudulent or dis-

honest act *that might involve the defendant in liability for the misconduct."* .

In *Farmers' Bank v. Ogden,* 192 Mo. App., 243, 182 S. W., 501, 504, 188 S. W., 201, the Court said: "In considering this phase of the case, we are not overlooking a construction of the contract which we think should be given to it, *viz.,* that where it turns out there was guilt, the surety company should have been given an opportunity to investigate for itself, and that the bank's *bona fide* conclusion that nothing was wrong ought not to bind the company. The real question is: Where, in fact, there was guilt, has anything come to the knowledge of the bank in regard to the employee which can reasonably be said to require inquiry or investigation? But, while this is true, it is, of course, not every act of a bank officer coming to the knowledge of the bank which must be reported to the surety company. The act must be of such character as to impress a business man of ordinary prudence and judgment that it should be looked into to see if it fell within the terms of the condition above quoted. If the act be such, the circumstances considered, that all reasonably prudent men of ordinary judgment would have but one opinion of it, that is, to bring it to this case, would consider that it indicated that * * * (the employee) was either 'unreliable, deceitful, dishonest, or unworthy of confidence,' then it would become the duty of the Court, in the absence of notice, to peremptorily declare to the jury the defendant was not liable. But, if the circumstances are such that an act which ordinarily might be bad appears to be so clearly innocent that men of ordinary prudence and judgment would think it did not even require investigation, the jury should be so instructed."

In a note, L. R. A., 1916-F, 721, it is said: "But, while the Courts have held that the employer is not bound to give notice merely on discovery of facts which might raise a suspicion of defalcation, where the bond requires notice immediately on the discovery of fraud or dishonesty of the

employee, it has been held that when the question of defalcation has passed beyond mere suspicion, and has become a probable fact, the employer should no longer delay in giving notice, and that a delay after such apparent defalcation in giving notice to the surety will be a violation of the provision of the bond requiring immediate notice."

And: "Thus, while recognizing the rule that the employer is not bound to give notice to the surety on the bond of the employee until the employer has required knowledge of specific fraudulent or dishonest acts of the employee such as might involve the insurer in liability, under a provision in a bond for indemnity against loss by fraud or dishonesty of the employee, that on discovery of such fraud or dishonesty the employer shall immediately give notice, and that if it fails to do so the bond shall be void, the Court in *Gamble-Robinson Co. v. Massachusetts Bonding & Ins. Co.* (1910), 113 Minn., 38, 129 N. W., 131, held that a verdict for the surety had been properly directed on the ground that the required notice was not given, where it was shown that the report of the employee, a traveling salesman, showed a shortage of over $500.00 in the amount remitted, and the only explanation given was that the apparent shortage was covered by credits and discounts which the employer had failed to allow customers; that, although the employer, during the succeeding three weeks, made a partial examination of the employee's accounts, the matter was left indefinite and nothing was done thereafter to determine the correctness of the report, the employee, however, recognizing the shortage by making small payments on the account out of his salary, until four weeks later when it was discovered that he had collected an account which had not been reported, and he was discharged and the surety company notified. The Court said that the question of shortage had passed beyond mere suspicion; that it was standing out as a probable fact, and there was no further ground for hesitancy; that it was not necessary to brand the employee as a thief; that all that

was required was to lay the facts before the insurer, and that the object of requiring the notice was to enable the insurer to make investigation and take the necessary steps to indemnify itself."

I am impressed with the reasoning of the Missouri Court, above quoted, that, even if the officers of the bank had arrived at the *bona fide* conclusion that nothing was wrong (as the respondent now claims), their conclusion should not be binding upon the surety company. I do not think it was possible for the finance committee, the directors, or the cashier to have reached such a conclusion under the circumstances. If their information had extended no further than that the supreme officers of the bank had clandestinely abstracted $61,000.00 of the bonds of the bank, intrusted to their custody, and appropriated them to their own uses, without the knowledge of a single officer of the bank, they could not have believed in the innocence of such an admittedly "irregular" and "shocking" transaction. They appear to have been entirely oblivious to the rights of the surety company, which of a certainty would have protected itself if the information had been extended to it.

That this condition as to notice was an important and valuable incident of the company's obligation appears too clear for argument.

In 25 C. J., 1100, it is stated: "It is very usually stipulated in fidelity policies or bonds that the insured shall notify the insurer of any act of dishonesty or infidelity or other default, involving a loss under such contracts, or of any loss resulting therefrom, immediately, or as soon as practicable, and the failure of the insured to comply with such a requirement will defeat a recovery. It is frequently required that such notice shall be in writing. The requirement of immediate notice or notice as soon as practicable ordinarily means notice within a reasonable time. What constitutes knowledge on the part of the insured, and what is reasonable time for giving notice to the insurer depend

entirely upon the circumstances of each particular case. The knowledge of an officer and director of a corporation is the knowledge of the corporation."

In *Trask v. State Fire & Marine Ins. Co.*, 29 Pa. St., 198, 72 Am. Dec., 622, the insurance contract provided that the company be notified forthwith in case of loss. The loss occurred on May 2nd, and the company was notified on May 13th. The Pennsylvania Supreme Court in deciding as a matter of law that there could be no recovery, held:

"We must decide this case according to the contract law, established by the parties for the definition of the relation between them. We may modify that contract law so as to give it an equitable adaptation to unanticipated events, but we cannot establish or introduce another in its stead.

"Certainly it is a contract condition of the defendants' liability that they shall be immediately notified of any loss insured against, and we cannot dispense with a compliance with this law unless the plaintiff shows some proper excuse for his non-compliance. We think a delay of eleven days in giving the notice is not a compliance with the contract, and that the plaintiff has presented no reasonable excuse for this.

"Then, by the terms of the contract, the defendants are discharged from liability."

In the case of *Edwards v. Lycoming County Mut. Insurance Co.*, 75 Pa., 378, policy of insurance required notice of loss by fire to be given to the secretary "forthwith." Held that the rule meant due diligence under all the circumstances, and eighteen days' notice was not in this case sufficient. The *Trask case* is expressly approved.

In *Travelers' Insurance Co. v. Nax* (C. C. A.), 142 F., 653, 660, in considering this point of notice under the stipulations of the policy, the Court said, "If in the trial in the Court below there had been, as to this point, any disputed facts or doubtful inferences from proven facts, they should of course have been submitted to the determination of the

jury; but where, as in this case, there are no disputed facts, but simply an admitted failure of the insured, or of any one on his behalf, to give the immediate written notice stipulated for in the policy, for a period of 72 days, without any satisfactory explanation of such failure, there was no question at all to be submitted to the jury, and the Court, as a matter of law, should have found that the stipulation had not been legally complied with. This view of the situation should have been manifested by the Court, by peremptory instructions to find for the defendant."

See also *Deer Trail Consolidated Mining Co. v. Md. Cas. Co.,* 36 Wash., 46, 78 P., 135, 67 L. R. A., 275; *Ermentrout v. Girard Fire & Marine Ins. Co.,* 63 Minn., 305, 65 N. W., 635, 30 L. R. A., 346, 56 Am. St. Rep., 481; *Foster v. Fidelity & Cas. Co.,* 99 Wis., 447, 75 N. W., 69, 40 L. R. A., 833.

The charge of the presiding Judge under review being erroneous, and there being sufficient evidence at least to carry the issue to the jury as to the knowledge of the finance committee, of the directors, and of the cashier, it follows that the error constitutes reversible error, and that there should be a new trial, if not a directed verdict.

The fourth exception complains of error in submitting to the jury the issue of waiver. It is as follows: "Because his Honor erred in submitting to the jury the issue as to whether or not the American Surety Company of New York had waived the provision of the bonds requiring that notice be given within ten days after discovery of any loss thereunder; whereas, it is respectfully submitted, that there was no evidence of any such waiver, and his Honor should have so instructed the jury, as requested by the defendant, American Surety Company of New York."

The surety company received from the receiver notice by telegram and letter of his claim against it. Both were acknowledged by the surety company on August 26th and with the acknowledgment the surety company forwarded to the

receiver blanks for stating the claim in accordance with the conditions of the bond. The letter also stated that the matter was being referred to the Atlanta office for investigation and report; there was no suggestion of denial of liability. The inspector was sent to Columbia and went to the bank several times, making examinations and obtained all the information desired; assistance and access to the records were furnished by the receiver and his assistants. The full itemized particulars of the claim were furnished by the receiver on the blank form provided by the company on October 28, 1926.

No objections were made by the surety company based upon the alleged failure to give ten days' notice, during this time, over three months, except in the letter of November 17, 1926, when the surety company stated: "With the understanding that we are not waiving or prejudicing any of our rights and interests, we accept your claim of $32,391.58 enclosed in your letter." This is the only suggestion until long after the suit was commenced, the demurrer entered, heard, and overruled, and the answer served on November 24th, in which for the first time this defense was suggested. We think that this was at least some evidence to be submitted to the jury on the question of waiver. *Rowell v. Ins. Co.,* 142 S. C., 461, 141 S. E., 20; *Allen v. Ins. Co.,* 139 S. C., 47, 137 S. E., 214; *Plyler v. United States F. & G. Co.,* 144 S. C., 116, 142 S. E., 45; *Jennings v. Clover Leaf Life & Casualty Co.,* 146 S. C., 45, 143 S. E., 668; *Whaley v. Ins. Co.,* 125 S. C., 176, 117 S. E., 209; *George Washington Fire Ins. Co. v. Adams,* 148 S. C., 238, 146 S. E., 15.

The fifth exception complains of error in reference to the degree of proof required to establish the breach of trust alleged. It is as follows: "Because his Honor erred in holding and charging the jury that the degree of proof required to establish the breach of trust with criminal intent on the part of I. M. Mauldin, which was the basis of the action, was the preponderance of the evidence merely; whereas, the

complaint having charged and his Honor having held that the action was based upon the charge of a breach of trust with fraudulent intent amounting to a crime, that the correct rule in establishing such charge required the proof of such crime beyond a reasonable doubt and not merely by the greater weight of the evidence."

The case of *Salley v. Globe Indemnity Co.,* 133 S. C., 345, 131 S. E., 616, 43 A. L. R., 971, decided February 5, 1926, is direct authority against appellant's position. Evidently appellant was relying upon expressions from the Court in *Murray v. Aiken, etc., Co.,* 37 S. C., 487, 16 S. E., 143. That decision, if it be considered a direct decision on the point, as to the degree of proof, is overruled by the *Salley case.*

The sixth exception complains of error in charging the law in reference to loans to an officer of the bank. It is as follows: "Because his Honor charged plaintiff's request II and II-A to the effect that an officer of a bank is forbidden by statute of this State to borrow from the bank without first obtaining the approval and consent, in writing, of two-thirds of the whole board of directors and that the jury might consider the failure to first obtain such consent and authority in determining whether or not I. M. Mauldin had committed a breach of trust with fraudulent intent as alleged in the complaint; whereas, it is respectfully submitted that such charge was erroneous for the reason that the only offense alleged was the taking of the bonds in breach of trust and any evidence of an independent or different breach of statute law was irrelevant for the consideration of the jury, was liable to mislead them, and was highly prejudicial to the defendants."

We think that the fact, if it was a fact, that Mauldin negotiated a loan, as was claimed, from the bank, in violation of the statute relating to loans to officers of banks, showed, necessarily, a consciousness of its illegality, which was a cir-

cumstance to be considered by the jury upon the main issue, so far as he was concerned, of the appropriation of the bonds with criminal intent.

The seventh exception complains of error as outlined thus:

"Because his Honor charged the plaintiff's 14th request as follows:

" 'The jury are instructed that neither the Finance Committee, nor Mr. Mauldin, nor Mr. Matthews, nor even the State Bank Examiner, while he had charge, nor the Board of Directors after the corporation became insolvent, could waive or discharge any rights which the bank had under any of the bonds sued on in this case.' "

For the reasons hereinbefore outlined we think that it was erroneous to charge the jury that the finance committee could not waive or discharge any rights which the bank had under the bonds sued upon. If the knowledge of the criminality of Mauldin had come to the finance committee at a meeting of that committee, engaged about the business of the bank of which the matter in question was in hand, its knowledge was imputable to the bank.

Under the case of *Law & Co. v. Farmers' & Merchants' Bank,* 123 S. C., 1, 115 S. E., 812, we think that if, during the period in which the bank examiner had control of the affairs of the bank, he had received knowledge of the criminality of Mauldin in the matter of the bond transaction, such knowledge would have been imputable to the bank, and it would have been the duty of the examiner to give the security company notice as required by the bond. The bond was an asset of the bank, and, while the examiner was in control, he should have taken such steps as were necessary to preserve the vitality and efficacy of the bond.

In reference to the board of directors, while their knowledge of the criminality of the act of Mauldin would unquestionably have been imputed to the bank, there is no evidence

tending to show that they received any before the collapse, and after it (the bank) was in charge either of the examiner or of the receiver.

The eighth exception complains of error as thus outlined:

"Because his Honor charged plaintiff's 17th request as follows:

" 'No action taken by the Board of Directors or by the State Bank Examiner after the bank was closed and during the thirty days that it was placed in the hands of the State Bank Examiner could condone, waive or discharge any of the rights of the bank or of its depositors and creditors.'

"It being respectfully submitted that the State Bank Examiner, while in control of the bank, under the statute was charged with the duty of caring for its assets and with taking all proper action to preserve the same, and that his failure to give the notice required by the bonds would bind the bank and operate to discharge the Surety Company in accordance with the express provision of his surety bonds."

This exception has practically been disposed of by what is said in reference to exception VII.

The ninth exception has practically been disposed of by what has been said above. It is as follows:

"Because his Honor refused to charge defendant, American Surety Company's seventh request, which was as follows:

" 'It is the rule in a case such as this that notice to the managing officer or officers in the course of his/their business as such officers is notice to the bank; and I charge you that if the finance committee (except Mauldin or Matthews) or the cashier of the American Bank & Trust Company in the discharge of their duties as such officers obtained knowledge or discovered that the Land Bank bonds had been taken and used by Mauldin without authority and without being paid for that would be knowledge on the part of the bank, and their failure to give notice or have notice given

to the Bond Company within ten days after such knowledge would relieve the Bond Company of liability for the loss of the bonds.'

"It being respectfully submitted that said request was pertinent and applicable to the case and should have been charged as requested.

"The first exception complains of error as thus outlined: 'Because his Honor, Judge Mann, erred in admitting evidence of the negotiations for a compromise of the controversy between James E. Peurifoy, as Receiver of the American Bank & Trust Company, and the attorneys for the estate of I. M. Mauldin and the American Surety Company, over the objection of the attorneys for the American Surety Company; it being respectfully submitted that the admission of such evidence was erroneous and contrary to the policy of the law, and prejudicial to the said defendant, and his Honor should have held that said testimony was irrelevant and incompetent as relating to a compromise and settlement of the issues in controversy.' "

It does not appear that the letters objected to were in any wise connected with a proposition of compromise, and hence there is no basis of the exception. Besides the letters were evidence directed against the National Surety Company, a party defendant in whose favor a verdict was rendered.

## APPEAL No. 2

*The appeals of the American Surety Company and of. the National Surety Company from the decree of his Honor, Judge Townsend, dated July 17, 1928.*

As hereinbefore stated, after the jury trial had been concluded, it appeared to the Court that a number of questions had arisen as to certain collateral securities which were in the hands of the receiver, and also as to an amount of money, some $5,000.00, which remained in the hands of the National Surety Company, after it had converted the bonds

pledged to it as indemnity to the appeal bond, and had settled with the Government.

Miss Ivy Mauldin, Southern Motor Company, and J. B. Bostick appeared to be interested in the collateral securities, and they were required by order to be made parties defendant by supplemental (*sic*) complaint. This was done, and these parties answered.

Miss Mauldin alleged that the securities which belonged to her were delivered by her to her father, Ivy M. Mauldin, for the purpose of effecting an exchange for, or a substitution of, the $30,000.00 of land bank bonds which had been appropriated by him; that this proposed arrangement was never consummated; and that the securities were her individual property which should be returned to her.

The Southern Motor Company alleged that the notes "which might have been given" to Miss Mauldin, and which were turned over to the receiver, have been paid in full.

J. B. Bostick alleged that he held a note of the Carolina Peanut Oil Company, for $7,500.00, secured by a mortgage of real estate; that he loaned the same to O. P. Loyal, for the purpose of effecting a settlement of certain financial differences between the Columbia National Bank on the one side, and Loyal, Mauldin, and others, on the other; that without authority Loyal delivered the note and mortgage to Mauldin, for the purpose of effecting the exchange referred to in the defense outlined above of Miss Mauldin; that the arrangement was never consummated, and that the securities were his individual property and should be returned to him.

The American Surety Company alleged that the collateral securities were deposited by Mauldin with the State Bank Examiner, as security for the $30,000.00 of land bank bonds appropriated by Mauldin, and afterwards delivered by the examiner to the receiver; that they should be first applied to any judgment rendered in the case, or in any

event, upon the payment of the judgment herein by the American Surety Company; that they should be delivered to it as its property. It is further alleged that any balance in the hands of the National Surety Company, remaining of the proceeds of the sale of the $30,000.00 bonds, after settlement with the Government, is applicable to the judgment rendered herein.

It is further alleged that in a settlement between the receiver and Southern Motor Company, to which it was not a party, the receiver released a note and mortgage of Southern Motor Company to Miss Mauldin for $4,200.00, which was part of the collateral put up by Mauldin to meet his obligation to return the $30,000.00 of land bank bonds appropriated by him, and that the value of said note and mortgage should be credited upon the judgment herein.

The answer of the National Surety Company is practically a general denial.

Loyal, as administrator of the estate of I. M. Mauldin, deceased, denies the rights of the American Surety Company as claimed.

The master took the testimony and filed his report dated June 22, 1928, sustaining the contentions of Miss Mauldin, Southern Motor Company, and J. B. Bostick, and finding that, as against the balance admitted to be due by the National Surety Company from the proceeds of sale of the land bank bonds, $5,464.63, the surety company was entitled to credit for:

| | |
|---|---|
| Attorney's fee in the main cause | $2,700.00 |
| Printing argument | 42.00 |
| Telegram | .82 |
| | $2,742.82 |

leaving a balance due by the surety company of $2,621.81 ($2,721.81?).

Upon exceptions by the American Surety Company and the receiver, his Honor, Judge Townsend, filed a decree

dated July 17, 1928, confirming the master's report in all particulars, except his allowance of the foregoing credit of $2,742.82 to the National Surety Company.

From this decree the American Surety Company and the National Surety Company have appealed.

The main issue in the appeal is the proper inference to be drawn from the facts relating to the alleged pledge by Mauldin of the securities which are claimed now by Miss Mauldin, Southern Motor Company, and J. B. Bostick, respectively. The master and the circuit Judge both conclude that the securities were never delivered to, or accepted by, the bank, the bank examiner, or the receiver, and that the alleged hypothecation never became effective.

While great respect should be and is conceded to the concurrent findings of the master and the circuit Judge, this is really an issue in chancery, and upon its determination this Court is charged with the duty of an independent investigation of the facts, and with its conclusions therefrom.

To obtain a clear grasp of the situation, it appears necessary to retrace some of the steps which have been adverted to in the discussion of Appeal No. 1:

On February 20, 1926, Mauldin and Matthews purchased, in the name of the bank, $61,000.00 of the land bank bonds, and appropriated them to their own personal uses, delivering them that day to the National Surety Company, as indemnity upon appeal bonds in connection with a controversy with the Government relating to their personal income taxes.

Ten days later, on March 1st, realizing that they had done an improper thing, at a regular meeting of the finance committee of the bank, they procured the adoption by the committee, composed of themselves and two others, of a resolution permitting them to *borrow* from the bond department of the bank $30,000.00 and $31,000.00, respectively, of bonds to be used temporarily in the matter above referred to. The resolution states: "The said J. Pope Matthews and

I. M. Mauldin to place with the Bond Department of Bank *their personal obligations, such as shall be acceptable to State Bank Examiner,* in place of bonds so borrowed."

(Note.—The addition of the words "such as shall be acceptable to State Bank Examiner" clearly indicates that something more than their *personal notes* was expected and required.)

The matter was called to the attention of the examiner before the bank closed, and in an interview with Mauldin he was shown the following paper (with the sufficiency of the securities listed thereon the examiner was satisfied, though making no formal entry of approval; the examiner was not at that time in control of the bank; his oral satisfaction appears to have been all that might be required) :

Exhibit A

"February 20, 1926

"This is to acknowledge that I have received from the American Bank & Trust Company of Columbia thirty (30) First Carolinas Joint Stock Land Bank bonds in denomination of one thousand ($1,000.00) dollars each, total par value of which is thirty thousand ($30,000.00) dollars.

"The aforesaid bonds are to be used as collateral to secure from the National Surety Company on my behalf a tax abatement bond running in favor of John F. Jones, Collector of Internal Revenue.

"In the place of these bonds I have sold and delivered to the bank the following securities:

100 shares American Bank & Trust Co., stock
    belonging to Ivy Mauldin (Miss Mauldin)$ 10,000.00
20 shares of American Bank & Trust Co., stock
    belonging to I. M. Mauldin . . . . . . . . . . . .   2,000.00
200 shares Southern Credit Co., stock belonging
    to Ivy Mauldin (Miss Mauldin) . . . . . . . .  20,000.00
10 shares Blue Ridge Bank stock belonging to
    I. M. Mauldin . . . . . . . . . . . . . . . . . . . . . .   1,000.00

Note Southern Motor Company belonging to
   Ivy Mauldin (Miss Mauldin) .......... 4,200.00

                                           $ 37,200.00
                        "(Signed) I. M. Mauldin
"I agree to above sale of my securities.
                        "(Signed) Ivy Mauldin."

Thereafter, and, as Bradley the Examiner testified, *after the bank had closed* and the Examiner had taken over the affairs of the bank "in sole possession and control" under the statute, and the only time that he was authorized to act as custodian of the collateral, Mauldin executed and delivered to Bradley the following paper and *delivered to him the securities named therein,* as Bradley specifically states (the paper is undated but according to Bradley's testimony, *it was delivered after he took charge*):

Exhibit B-1

"State of South Carolina, County of Richland.
"To W. W. Bradley, State Bank Examiner:
"This is to acknowledge that I have bought from the Bond Department of the American Bank & Trust Company thirty (30) First Carolinas Joint Stock Land Bank bonds in denomination of one thousand ($1,000.00) dollars each, total par value thirty thousand ($30,000.00) dollars, said bonds being bought pursuant to and by authority of a resolution of the Finance Committee of the American Bank & Trust Company of Columbia.

"The resolution referred to permitted and authorized the said bank to sell me the aforesaid bonds in exchange for other securities acceptable in value to the State Bank Examiner, said bonds to be used as collateral to secure from the National Surety Co., on my behalf, a tax abatement bond running in favor of John F. Jones, Collector of Internal Revenue.

"Upon presenting the facts and circumstances to the State Bank Examiner actual delivery of the bonds being previously made to me, he required that I personally guarantee the bank against loss in the transaction and it being further understood that I should guarantee to the bank income from the securities sold equivalent to 7% on the cost price of the bonds, computed annually.

"The following is a list of the securities transferred to the bond department of the American Bank & Trust Company and the same are hereby deposited with the State Bank Examiner as custodian:

| | |
|---|---|
| 100 shares American Bank & Trust Co., stock belonging to Ivy Mauldin | $ 10,000.00 |
| 20 shares American Bank & Trust Co., stock belonging to I. M. Mauldin | 2,000.00 |
| 200 shares Southern Credit Co., stock belonging to Ivy Mauldin | 20,000.00 |
| 10 shares stock Blue Ridge Bank stock belonging to I. M. Mauldin | 1,000.00 |
| Note Southern Motor Company belonging to Ivy Mauldin | 4,200.00 |
| | $ 37,200.00 |

"I hereby consent for I. M. Mauldin to use the securities listed above standing in my name for the purposes indicated herein.

"(Signed) Ivy Mauldin.
"(Signed) W. W. Bradley,
"State Bank Examiner."

On or about July 5th, the examiner, who was then in control, required of Mauldin additional security to meet his guaranty that the bank should lose nothing by his misappropriation of the land bank bonds. Accordingly Mauldin delivered the following paper to the examiner:

"Exhibit C

"Columbia, South Carolina, July 5th, 1926.

"Mr. W. W. Bradley, State Bank Examiner, Columbia, S. C. Dear Mr. Bradley: In compliance with your instructions to me, in connection with my purchase, some time ago, of thirty (30) First Carolinas Joint Stock Land Bank bonds from the Bond Department of The American Bank & Trust Company, and the sale by me of other securities to said Bond Department with stock of The American Bank & Trust Company included therein, which has probably depreciated in value since the closing of said bank, *I am herewith delivering to you* certain other securities.

"In view of this probable depreciation in the value of the stock of the American Bank & Trust Company, and you having required that additional securities be deposited with you, *I hereby turn over to you* for the purpose above indicated, the following securities, to wit:

"Note—secured by 1st mortgage of R. E. covering property in the City of Columbia having an appraised value of $20,000.00, the amount due on said paper to June 1st, 1926, being $10,125.00.

"*You will kindly hold these securities,* as above indicated, for the purpose of protecting The American Bank and Trust Company against loss in the aforesaid transaction, and securing them for interest on the cost of the First Carolinas Joint Stock Land Bank bonds, at the rate of seven per cent (7%) per annum.

"(Signed) I. M. Mauldin.

"Approved:                "(Signed) W. W. Bradley,
                "State Bank Examiner for S. C."

From the time that Judge Peurifoy took charge as receiver, July 20, 1926, until some time in December, Bradley retained possession of the securities that had been delivered to him by Mauldin. In August the receiver called upon him for what collateral he had, and on the 20th he

replied: "The securities I hold for J. P. Matthews and I. M. Mauldin in the bond transaction, I will bring down to you the first time I am at the bank. I am still pressing these parties for cash on this transaction, and one of them, at least, is prepared to pay. The other I hope to have arranged for payment within the next several days."

A short time before December 20th the examiner turned over to the receiver the securities which had been delivered by Mauldin to him.

It is important to note the condition of the securities delivered to Bradley as relates to indorsements:

Owned by Miss Mauldin:

100 shares American Bank & Trust Company, two certificates of stock, 50 shares each. Indorsed in blank by Miss Mauldin and witnessed by Etheridge.

200 shares Southern Credit Company, certificate indorsed by Miss Mauldin and witnessed by Etheridge.

Note Southern Motor Company, payable to Miss Mauldin and indorsed by her.

Owned by I. M. Mauldin:

20 shares American Bank & Trust Company, indorsed by I. M. Mauldin.

10 shares Blue Ridge Bank. Indorsed by I. M. Mauldin.

Note of Carolina Peanut Oil Company. Indorsed without recourse by the payee, J. B. Bostick, and by I. M. Mauldin.

In addition to the indorsement of Miss Mauldin was the consent signed by her: "I hereby consent for I. M. Mauldin to use the securities listed above standing in my name for the purposes indicated herein."

The shares of stock in the American Bank & Trust Company, which belonged to Miss Mauldin, appear to be worthless; so that the only ones in the list of securities which she has any debatable interest in is the note of the Southern Motor Company for $4,200.00 and the 200 shares of stock of the Southern Credit Company.

If there is anything which she could have done to pledge these securities for her father's obligation to the bank, and which she did not do, we do not know what it could have been. That Mauldin had control of the securities for the purpose of carrying out the resolution of the finance committee there can be no doubt. Miss Mauldin, who owned them, indorsed them, put them in the possession of Mauldin, and consented in writing that he should do exactly what he did, pledge them to secure his obligation to the bank. Upon the issue whether or not the pledge was accepted on behalf of the bank, we do not think that there can be a shadow of doubt. When the securities were first listed by Mauldin, Exhibit A, dated February 20th, as complying with his promise in the resolution (it must have been dated back to February 20th, as the meeting of the finance committee was on March 1st), the list was shown to the examiner and orally approved by him. That was before the collapse of the bank, and the examiner was under no obligation to take custody of the securities. Soon after he took charge, Mauldin executed a more formal paper and delivered it with the securities to the examiner and constituted him the custodian of them specifically in words, to which Miss Mauldin consented. Not only that, but, when the examiner called for additional security, Mauldin delivered the Bostick note and mortgage in addition, as he states, to the "other securities" which he had delivered.

Of course it was the examiner's duty, as soon as the receiver was appointed, to turn over all of these securities to him, which he was requested to do; but for some reason he took it upon himself to endeavor to collect the amount for which the securities stood sponsor, and made constant efforts, holding them as the property of the bank, to accomplish this object, until December, 1926, when he turned them over to the receiver. Certainly the examiner being in possession and control of the affairs of the bank had the right,

and it was his duty, to accept the securities for the bank—no one else at that time could have done so. With the appointment of the receiver, the title and right to possession passed to the receiver, and the fact that the examiner held possession of the securities after the appointment of the receiver could not possibly have affected the right of the receiver to them. The master has found, and the circuit Judge has concurred, that the note of the Southern Motor Company has not been paid as claimed by the company, but remains the property of Miss Mauldin as a valid obligation against the company. In this we concur, but conclude that she holds the title to it subject to the pledge which she consented that Mauldin should make of it.

We think that the same conclusion must be reached in reference to the Bostick note and mortgage. It appears that the Carolina Peanut Oil Company gave a note and mortgage to J. B. Bostick. Bostick assigned them in blank without recourse. Mauldin got possession of them, indorsed them in blank and delivered them to the examiner by the paper Exhibit C-1. Bostick claims that the note and mortgage were loaned by him to Loyal for the special purpose of making a settlement with the Columbia National Bank which held claims against Loyal, Mauldin, and others, and they were not so used.

Bostick delivered possession of the securities to Loyal, with his blank indorsement "without recourse" upon them, and as Loyal breached faith with Bostick and permitted Mauldin to get possession and assign and deliver them to the examiner a purchaser, although by collateral, for value without notice, he must bear the consequences of his misplaced confidence in Loyal. *Montgomery v. Scott,* 9 S. C., 20, 30 Am. Rep., 1; *Maxwell v. Foster,* 67 S. C., 385, 45 S. E., 927; *Anderson v. Bank,* 97 S. C., 453, 81 S. E., 158.

In reference to the claim of the American Surety Company to be subrogated to the rights of the bank in the se-

curities which were pledged to the bank, that claim is available of course only upon payment by the surety company of the judgment herein. We do not understand the law to be that the company must pay the judgment as a condition precedent *to setting up* its claim to subrogation. There can be no valid objection to the surety's denying all liability, and at the same time claiming, in the event that that issue be decided against it, that subrogation will permit it to have the benefit of the securities held by the creditor as collateral to the obligation for which the company stands surety. 25 R. C. L., 1324, *et seq.*

As the National Surety Company admits that it has in its hands a balance of $5,464.63, excess funds remaining from the proceeds of the sale of the land bank bonds pledged with it by Mauldin, after discharging his tax obligation to the United States Government for which the bonds were deposited with the National Surety Company, and as Mauldin gave them a written order about April, 1927, to pay this fund to the receiver, we see no reason why they should not pay interest thereon from April 1, 1927, at 7 per cent per annum.

We are entirely satisfied with the conclusions of the circuit Judge in reference to the disallowance of credit to the National Surety Company of the items aggregating $2,742.-82.

The judgment of this Court should be:

1. That the judgment in favor of the receiver against the American Surety Company, in the jury trial before his Honor, Judge Mann, be reversed.

2. That the decree of his Honor, Judge Townsend, be modified to conform to the conclusions herein announced.

3. That the case be remanded to the circuit Court for a new trial upon the jury issues and for such administrative orders and such judgments as may be consistent with the foregoing conclusions.